**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| FERNANDEZ INNOVATIVE TECHNOLOGIES, L.L.C., Plaintiff, | ) | |
| v. | ) | Civil Action No. 07 CV 1397 |
| GENERAL MOTORS CORPORATION; ONSTAR CORPORATION; MERCEDES-BENZ, USA, LLC; TOYOTA MOTOR SALES, U.S.A., INC.; BMW OF NORTH AMERICA, LLC; @ROAD, INC., Defendants. | ) | Judge Virginia Kendall<br>Magistrate Judge Maria Valdez |

**DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF**

Dated: January 18, 2008

# TABLE OF CONTENTS


**I. INTRODUCTION ........................................................ 1**

**II. BACKGROUND ........................................................ 1**

A. The ‘899 Patent ........................................................ 1

B. The Accused Technology ........................................................ 2

**III. CONSTRUCTION OF THE DISPUTED CLAIM TERMS ........................................................ 3**

A. “Network,” “Client,” and “Server” (Claim 1) ........................................................ 4

1. The Network Consists of Client and Server Computers ........................................................ 4

2. The Computers Are Connected by Telecommunications Links ........................................................ 6

B. “On-line” (Claim 1) ........................................................ 7

C. “Client Attribute” (Claim 1) ........................................................ 9

D. “Client Sensor” (Claim 1) ........................................................ 11

E. “Associated Client” (Claim 1) ........................................................ 12

F. “Real-time Configuration” ........................................................ 15

G. “Electronic Digital Feedback or Control Signal” (Claim 1) ........................................................ 17

H. “Messages” (Claim 1) ........................................................ 18

I. “Directing One or More Messages…” (Claim 1) ........................................................ 19

1. The Server Selects and Downloads the Message ........................................................ 20

2. The Server Directs the Message to Every Client in the Set ........................................................ 21

J. “The One or More Clients” (Claim 1) ........................................................ 23

K. “Interface Receiving First Network Signal…” (Claim 7) ........................................................ 23

**IV. CONCLUSION ........................................................ 25**

# TABLE OF AUTHORITIES

## Cases

*Bell Atlantic Network Servs., Inc. v. Covad Commc'ns Group, Inc.*,
262 F.3d 1258 (Fed. Cir. 2001)........................................................................ 8

*Datamize, LLC v. Plumtree Software, Inc.*,
417 F.3d 1342 (Fed. Cir. 2005)........................................................................ 16

*Hill-Rom Co. v. Kinetic Concepts, Inc.*,
209 F.3d 1337 (Fed. Cir. 2000)........................................................................ 8

*Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*,
450 F.3d 1350 (Fed. Cir. 2006)........................................................................ 8

*Laitram Corp. v. Morehouse Indus., Inc.*,
143 F.3d 1456 (Fed. Cir. 1998)........................................................................ 8

*Norian Corp. v. Stryker Corp.*,
432 F.3d 1356 (Fed. Cir. 2005)........................................................................ 14

*O.I. Corp. v. Tekmar Co.*,
115 F.3d 1576 (Fed. Cir. 1997)........................................................................ 8

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)........................................................................ passim

*Renishaw PLC v. Marposs Societa' er Azioni*,
158 F.3d 1243 (Fed. Cir. 1998)........................................................................ 4

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
242 F.3d 1337 (Fed. Cir. 2001)........................................................................ 8

*Sulzer Textil A.G. v. Picanol N.V.*,
358 F.3d 1356 (Fed. Cir. 2004)........................................................................ 19

## Statutes

35 U.S.C. § 112................................................................................................ 16

## I. INTRODUCTION

Defendants General Motors Corporation, OnStar Corporation, Mercedes-Benz USA, L.L.C., Toyota Motor Sales, U.S.A., Inc., BMW of North America, L.L.C., and @Road, Inc. (collectively, "Defendants"), jointly submit this brief in support of their proposed constructions for the disputed claim terms in U.S. Patent No. 6,963,899 ("the '899 patent").[1]

Defendants' proposed constructions accurately reflect the meanings that a person of ordinary skill in the art would glean from the claim language, the specification, and the prosecution history of the '899 patent. By contrast, the constructions proposed by Fernandez Innovative Technologies, L.L.C. ("Plaintiff") reflect generic dictionary definitions or out-of-context snippets of specification text, resulting in a claim scope that far exceeds the targeted on-line marketing "invention" described in the patent.

## II. BACKGROUND

### A. The '899 Patent

U.S. Patent No. 6,963,899, titled "Adaptive Direct Transaction for Network Client Group," issued on November 8, 2005, with a claimed priority date of Sept. 1, 1998. (Joint Appendix ("JA"), Ex. A) The patent contains 18 claims, of which claims 1, 7 and 17 are independent. Plaintiff is asserting only claims 1-4 and 7-8. (Pl's Br. at 2-3)

According to the '899 patent, the alleged invention solved a problem with existing Internet-based computer systems for marketing and distributing goods and services, namely, a limited ability to perform targeted marketing. (*See* JA, Ex. A, 1:19-30)[2] The named inventors sought to solve this problem with distributed client-server software "for directing or targeting on-

---

1 The parties' proposed constructions were set forth in the Joint Proposed Preliminary Claim Chart filed December 3, 2007 (DE 104).

2 Citations to the '899 patent are in the form of [column]:[line]-[line].

line messages or electronic signals to selected or classified client set or group adaptively or dynamically according to monitored or specified set characteristics or attributes." (*Id.* at 2:30-33, 1:13-15) In plain English, the alleged invention essentially is a computer system that enables commercial messages (*e.g.*, advertising) to be downloaded over the Internet to targeted recipients that are grouped according to information detected by sensors.

**B. <u>The Accused Technology</u>**

Plaintiff contends that each Defendant has infringed the '899 patent as a result of its activities relating to technologies that broadly can be classified as "vehicle telematics." This field of technology generally encompasses systems that involve the collection, transmission and use of information gathered from a vehicle to, for example, provide driver assistance in the event of a crash, track fleet vehicle locations, or provide remote maintenance diagnostics.

In its opening brief, Plaintiff purports to provide the Court with a "basic understanding" of each Defendant's accused products and/or services. (Pl's Br. at 4) However, Plaintiff's self-described "extremely simplified view" is not supported by a single piece of evidence, and reflects only self-serving and often inaccurate characterizations of the accused technologies using terminology that, not coincidentally, tracks Plaintiff's proposed claim constructions.

A detailed discussion of each Defendant's accused technology is beyond the scope of this brief, but Defendants agree that the Court should have a general understanding of them to lend context to the claim construction analysis. To that end, Defendants offer the following description of the General Motors OnStar system as being generally representative of the type of vehicle telematics technology that Plaintiff accuses of infringing the '899 patent.

OnStar uses in-vehicle Global Positioning System ("GPS") receivers and cellular technology to link vehicles and drivers to a central call center, where advisors offer personalized help. For example, OnStar and other accused systems can detect when a vehicle has crashed and

send a distress signal to the call center. Such services combine technology that existed long before the '899 patent, namely GPS, mobile phones, and airbags.[3] Airbags have long been triggered based on accelerometers—devices that measure changes in vehicle velocity. In vehicles equipped with OnStar, the same device that triggers the airbag also tells the vehicle's phone/modem to place a phone call to the call center. The advisor can then ask if the occupant requires assistance and, if needed, contact emergency personnel to provide them with the vehicle's location.[4]

## III. <u>CONSTRUCTION OF THE DISPUTED CLAIM TERMS</u>

Defendants generally agree with Plaintiff's recitation of the black letter legal principles governing claim construction, as it largely tracks the methodology reaffirmed by the Federal Circuit in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*). In terms of emphasis, however, Plaintiff significantly understates the importance of the specification, which the Federal Circuit has repeatedly stressed is the primary resource for construing claims. *See id.*, (citing cases). Over-reliance on supposed "ordinary meanings" of claim terms without adequate grounding in the specification runs the risk of adopting an erroneous construction that extends far beyond anything the inventors may have invented:

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Id.* at 1316 (quoting *Renishaw PLC v. Marposs Societa' er Azioni*, 158 F.3d 1243, 1250 (Fed.

---

[3] The evidence will show that OnStar was introduced in February, 1996 at the Chicago Auto Show—over two years before Plaintiff's claimed priority date—and thus is prior art to the '899 patent.

[4] Defendant @Road's accused systems do not detect vehicle crashes or utilize a call center, but rather identify the locations or other criteria of various vehicles in a customer's fleet.

Cir. 1998) (emphasis added)). As will be shown below, Plaintiff's proposed constructions bear little resemblance to the alleged invention described in the '899 patent.

### A. "Network," "Client," and "Server" (Claim 1)[5]

| Claim Language | Defendants | Plaintiff |
|---|---|---|
| In a ***network*** comprising a ***server*** coupled to one or more ***clients***, a method for directed on-line commerce comprising the steps of: | Network: Computers interconnected by telecommunications links.<br><br>Server: A computer shared by one or more remote clients over a telecommunications network.<br><br>Client: A computer that accesses a shared resource on a server over a telecommunications network. | Network: An arrangement of components, or nodes, and interconnecting branches.<br><br>Server: A device or computer system that is dedicated to providing specific facilities to other devices attached to the network.<br><br>Client: An agent that requests services of a server. |

Plaintiff attacks Defendants' constructions as including two "imported" requirements: (1) that the server and client(s) comprising the network comprise computers, and (2) that those computers are connected by telecommunications links. (Pl's Br. at 14-16) Both requirements, however, are fully consistent with the scope of the alleged invention described in the '899 patent.

#### 1. The Network Consists of Client and Server Computers

The very first line of substantive text in the '899 patent informs the reader that the "[i]nvention relates to networked *computer* applications, particularly to distributed client-server software…." (JA, Ex. A, 1:13-14 (emphasis added)) The patent goes on to explain that the alleged invention is directed to solving a perceived deficiency with "*computer programs*… developed for distributed applications between client and server processors interconnected through local and/or wide area networks," and particularly "web-based software ... for promoting, managing or otherwise transacting business on-line." (*Id.* at 1:18-29 (emphasis added)) Accordingly, a person skilled in the art would conclude that the "clients" and "servers"

---

5 The client-server network architecture provides the context for the alleged invention of claim 1, and as such, the related terms "network," "client" and "server" are addressed together.

comprising the "network" must include computers.[6]

In trying to avoid limiting the claims to computers, Plaintiff suggests that a vehicle, a patient, an office or a school can itself be a client, irrespective of whether it includes a computer (*i.e.*, there is nothing in Plaintiff's construction that requires the presence of any computer). (*See* Pl's Br. at 14) However, Plaintiff ignores the patent's disclosure that the "[i]nvention resides in *software*." (JA, Ex. A, 1:33 (emphasis added)) People, cars, and buildings do not execute software; computers do.

Significantly, Plaintiff has failed to identify any disclosure in the '899 patent that is inconsistent with limiting the network of claim 1 to a collection of interconnected computers. Plaintiff variously points to (1) Figure 1, which shows a "network system 4" arranged between a plurality of "server processors or nodes 2" and "client processors or nodes 10, 20, 30," (2) a brief description of the "network interfaces" for the clients in Figure 1, and (3) a statement that the "server or client processing functionality may be embodied in one or more processing machines or devices." (Pl's Br. at 13-16, citing JA, Ex. A, Figure 1, 1:65-67, 2:5-10, 16-20) However, a person skilled in the art would understand that terms like "processor" and "processing machine" refer to computers of some type, particularly given the patent's emphasis that the invention lies in "networked computer applications" and "software." (*See, e.g.*, JA, Ex. A, 1:13-15, 33-35)

In contrast to Defendants' approach, Plaintiff's proposed construction for "client" is not based on any disclosure in the '899 patent, but instead is drawn from a dictionary. (*See* Pl's Br. at 15) While Defendants do not believe that resorting to dictionaries is necessary, there are a wealth of definitions available that are far more pertinent to the technology described in the

---

6 This is also consistent with how the term "client-server" is commonly understood, providing further confirmation of the accuracy of Defendants' proposed constructions. *See* CASSELL CONCISE DICTIONARY, 295 (1997) ("a computer system in which networked workstations receive data from a central server") (Ex. 1).

patent, and that fully support Defendants' construction. *See, e.g.*, MERRIAM-WEBSTER ON-LINE DICTIONARY (www.merriamwebster.com) ("a computer in a network that uses the services (as access to files or shared peripherals) provided by a server.") (Ex. 2); MICROSOFT PRESS COMPUTER DICTIONARY, 92 (3d. ed. 1997) ("On a local area network or the Internet, a computer that accesses shared network resources provided by another computer (called a server).") (Ex. 3).

Likewise, Plaintiff's dictionary definition of "server" is far broader than the specification supports. For example, under Plaintiff's construction a printer accessible by two computers over a network qualifies as a server (*i.e.*, it is a device that provides printing facilities to other devices on the network), but there is nothing in the patent to support such a broad meaning.[7]

### 2. <u>The Computers Are Connected by Telecommunications Links</u>

The parties agree that the "network" recited in claim 1 must consist of devices interconnected to one another in some manner. Under Defendants' construction, the clients and server are connected by "telecommunications links," whereas Plaintiff's construction requires only "interconnecting branches." Defendants' construction aligns much more naturally with the disclosure in the '899 patent.[8]

Though not used in the patent, "telecommunications link" is a common term that encompasses the various forms of "on-line" communications discussed in the '899 patent. For

---

7 As with "client," it is easy to find examples of dictionary definitions for "server" that comport with the technology described in the '899 patent more than Plaintiff's proposed definition does. *See, e.g.*, CASSELL CONCISE DICTIONARY, 1347 (1997) ("a computer program to manage shared access to a network service") (Ex. 1); THE COMPUTER DESKTOP ENCYCLOPEDIA, 806 (Computer Language Co. 2d ed. 1999) ("A computer in a network shared by multiple users.") (Ex. 4); MICROSOFT PRESS COMPUTER DICTIONARY, 430 (3d. ed. 1997) ("On a local area network (LAN), a computer running administrative software that controls access to the network and its resources, such as printers and disk drives, and provides resources to computers functioning as workstations on the network.") (Ex. 3).

8 Plaintiff professes to construe "network" in accordance with how the term "is plainly and ordinarily used and understood" (Pl's Br. at 13), but the dictionary definition that Plaintiff proposes is so broad and so generic that it would not even require computers, just interconnected "components" or "nodes." As demonstrated above, this would be far outside the scope of the claimed network.

instance, the patent discusses clients and servers coupled to one another "according to standard Internet Protocol or other conventional digital networking and data communications scheme." (JA, Ex. A, 1:65-2:2) The term "telecommunications links" fairly captures such couplings, and indeed is consistent with how people skilled in the art would understand how one would use an Internet-based system of the type to which the invention purports to be directed. (*See id.* at 1:19-29) In fact, the dictionary from which Plaintiff pulled its definition of "network" alternately defines the term "telecommunications" as "transmission of signals over long distance, such as by telegraph, radio, or television" and "transmission of information from one point to another," both of which are consistent with how the term is used in Defendants' construction. AUTHORITATIVE DICTIONARY OF IEEE STANDARD TERMS, 1154 (IEEE Press 7th ed. 2000) (Ex. 5).[9]

### B. "On-line" (Claim 1)

| Claim Language | Defendants | Plaintiff |
|---|---|---|
| In a network comprising a server coupled to one or more clients, a method for directed ***on-line*** commerce comprising the steps of: | Using the Internet. | Connected to a network or available from a network. |

The term "on-line," used in the phrase "directed on-line commerce," should be construed to mean "using the Internet." The specification repeatedly uses the term "on-line" to refer to the Internet when describing the invention. For example, it states that the "[i]nvention resides in software for directing on-line messages" and summarizes this invention as "*Internet-based* software and associated database provide group analysis overlay to monitor client-server *web traffic* and provide direct marketing to client group." (JA, Ex. A, 1:33-35 (Summary of

9 In arguing for its generic definition of "network," Plaintiff points to a statement in the specification that the "present embodiment may be implemented and/or performed using any digital local or wide-area network 4 ..." (JA, Ex. A, 4:32-33), yet fails to explain how that statement is in any way inconsistent with Defendants' construction.

Invention and Abstract[10])(emphasis added)) The specification describes, as an "important aspect of present invention," that the "*Internet-based* client interface 10, 20, 30 and associated database 100 effectively provide group analysis processing to monitor client-server web traffic and deliver direct marketing services to client group." (*Id.* at 7:64-8:2 (emphasis added))[11] This is consistent with the Background of Invention against which the invention was developed — "web-based software . . . for . . . business on-line," particularly using "the Internet and its associated World-Wide Web" for "direct marketing." (*Id.* at 1:18-29) Construing "on-line" to mean "using the Internet" "most naturally aligns with the patent's description of the invention" and thus should be "the correct construction." *Phillips*, 415 F.3d at 1316.

Contrary to Plaintiff's assertion, Defendants' construction does not limit the claim to the inventors' preferred embodiment. (Pl's Br. at 16) As demonstrated above, the term "on-line" is equated with the Internet throughout the '899 patent — not only in the preferred embodiment section, but also in the Abstract, Summary of Invention, Background of Invention, and the remainder of the written description. Such consistent usage is sufficient by itself to construe the term likewise.[12]

---

10 The Federal Circuit includes a patent's abstract as a key resource for claim construction. *Hill-Rom Co. v. Kinetic Concepts, Inc.*, 209 F.3d 1337, 1341 n.* (Fed. Cir. 2000) (finding that abstract is useful source for meaning of disputed claim term); *see also SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1342-43 (Fed. Cir. 2001) (affirming claim construction because abstract limited the patent to particular lumen catheters).

11 This emphasis on the "important aspect" of the invention dictates a construction based on the Internet. *See, e.g.*, *Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*, 450 F.3d 1350, 1355 (Fed. Cir. 2006) (affirming summary judgment of noninfringement based on construction that limited scope of claim to what specification characterized as "'very important feature' of the invention").

12 *Bell Atlantic Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1273, 1277 (Fed. Cir. 2001) (term "defined by implication" through consistent reference) (citation omitted); *Laitram Corp. v. Morehouse Indus., Inc.*, 143 F.3d 1456, 1463 (Fed. Cir. 1998) ("nothing in the written description suggests that the driving surfaces can be anything but flat"); *O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1581 (Fed. Cir. 1997) (limiting claims because the specification described only conical passages).

By contrast, Plaintiff points to no reference to "on-line" in the specification, but instead relies upon a description of the "network" and a dictionary. *Id.* This ignores the primacy of the specification in claim construction. *Phillips*, 415 F.3d at 1315. It also leads to the bizarre result that Plaintiff's claimed invention of "a method for directed on-line commerce" need not even involve computers, in that Plaintiff's definition of "network" is merely any "arrangement of components, or nodes, and interconnecting branches." (Pl's Br. at 13) This is inconsistent with the '899 patent, which requires interactions between computers. *See* pages 4-6, *supra*.[13]

### C. "Client Attribute" (Claim 1)

| Claim Language | Defendants | Plaintiff |
|---|---|---|
| determining for each client one or more ***client attributes*** according to data received from one or more sensor interfaces, wherein the one or more client attributes determination is provided by a server | An objective condition of the client capable of being physically detected by a sensor. | Monitored signals, data, or values of the client or an objective condition of the client capable of being physically detected by a sensor. |

The parties agree that the term "client attribute" should be construed to mean "an objective condition of the client capable of being physically detected by a sensor." However, Plaintiff also improperly adds the language underlined above to include "monitored signals, data, [and] values." (Pl's Br. at 17) This conflates what constitutes a client attribute (*i.e.*, an objective condition) with how the attribute is represented (*i.e.*, signals, data, and values).

The specification makes clear that client attributes are solely objective conditions, providing examples of client attributes and describing how they are detected:

- "[c]lient sensor interface provides mobile location, medical condition, or other attribute" (JA, Ex. A, 1:39-40 (Summary of Invention));

---

13 It also is contrary to other dictionary definitions of the term "on-line." *See, e.g.*, DICTIONARY OF COMPUTER AND INTERNET TERMS, 328 (Barron's 6th ed. 1998) ("on-line" means "connected to a computer or available through a computer") (Ex. 6); QUE'S COMPUTER & INTERNET DICTIONARY, 370 (6th ed. 1995) ("on-line" means "[d]irectly connected with and accessible to a computer . . . [i]n data communications, connected with another, distant computer; for example, the successful connection with a host computer in a client-server network") (Ex. 7).

- "monitored or sensed client attributes (e.g., time, location, temperature, available resources, etc.)" (*id.* at 3:64-65);
- "electronically to monitor, diagnose and/or control data signals, alarm or out-of-specified range condition, pre-specified states, or other objectively detectable or [*sic*] attributes" (*id.* at 5:36-39, 6:9-12, 6:39-41);
- "in case of vehicle client interface 10, one or more clients having certain sensed or specified characteristics or other attributes, such as having certain serial or model numbers, tracked geographic location, etc." (*id.* at 8:19-23).

The "signals, data, and values" to which Plaintiff refers are not the attributes themselves; they are representatives of the objective conditions physically detected by sensors. Plaintiff's own support for its proposed construction makes this point:

> Generally, subject attribute or generated signal may represent one or more monitored signals, data, or values, such as client location, elapsed or actual time, client or user entry selection, physical, mechanical, medical or other objective condition, as well as any affiliation or subscription associated with subject client.

(*Id.* at 3:21-26 (cited in Pl's Br. at 17)) Thus, a "client attribute" is one of these "objective conditions." In the example of a client in a vehicle, the vehicle's speed (*e.g.*, sixty miles per hour) would be a client attribute; the number of electrical pulses emitted by a vehicle speed sensor would be a datum or value representing the attribute, but not the attribute itself.

The other claims make the point as well. Independent claim 7 and dependent claims 8-11 use "signal," "data value," and "sensor signal" similarly to the way independent claim 1 and dependent claims 2-5 use "client attribute" and "attribute." (*Id.* at claims 1-5 & 7-11) Plaintiff's reading of "monitored signals, data, or values" into "client attribute," therefore, is inconsistent with other claims in the '899 patent that explicitly use those words.[14]

---

[14] *See, e.g.*, *Phillips*, 415 F.3d at 1314 ("Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term. . . . Differences among claims can also be a useful guide in understanding the meaning of particular claim terms.") (citations omitted).

**D. "Client Sensor" (Claim 1)**

| Claim Language | Defendants | Plaintiff |
|---|---|---|
| at least one sensor interface electronically accessing one or more ***client sensor*** coupled locally to an associated client for real-time monitoring or configuration thereof | A device used to physically detect an objective condition of the client. | A device used to physically detect information about the client. |

As Plaintiff notes, the difference between Plaintiff's and Defendants' respective constructions of "client sensor" correlates with the difference between their constructions of "client attribute." (Pl's Br. at 17) The primary difference is whether the sensor detects objective conditions, as Defendants propose, or any client information at all, as Plaintiff contends.

Defendants' proposed construction is consistent with the specification; Plaintiff's is vague, ambiguous, and overly broad. The phrase "information about the client" in Plaintiff's proposed construction is limitless and nowhere described in the specification. Nor is "information about the client" limited to what is physical and, therefore, to what could be "physically detected" by the "client sensor"; an "objective condition," in contrast, can be "physically detected," as the claim requires. The specification shows that a "client sensor" physically detects "objective conditions," not merely any "information" at all:[15]

> Examples include "temperature, pressure, accelerometer or movement sensors . . . mechanical (e.g., internal combustion engine timing, mechanical linkage stress or strain, transmission, and related drive train monitor, vehicle braking or brake anti-locking, fuel delivery and storage, passenger restraint, emergency condition, seatbelt securement or airbag deployment, or impact detection, diagnosis and/or control thereof), and/or electrical (e.g., engine ignition, lighting, thermal cooling/heating, entertainment, communication, dispatching, or navigational appliance or device, and/or other electronic module monitor, diagnosis and/or

---

[15] This also is consistent with the dictionary definition of "sensor." *See, e.g.*, MICROSOFT PRESS COMPUTER DICTIONARY, 428 (3d. ed. 1997) ("sensor" means "[a] device that detects or measures something by converting nonelectrical energy to electrical energy") (Ex. 3); THE COMPUTER DESKTOP ENCYCLOPEDIA, 766 (Computer Language Co. 1996) ("sensor" means "[a] device that measures or detects a real world condition, such as motion, heat or light and converts the condition into an analog or digital representation") (Ex. 8).

control thereof), etc."

(JA, Ex. A, 5:44-6:6)

**E. "Associated Client" (Claim 1)**

| Claim Language | Defendants | Plaintiff |
|---|---|---|
| at least one sensor interface electronically accessing one or more client sensor coupled locally to an ***associated client*** for real-time monitoring or configuration thereof | The single client to which a particular client sensor is locally coupled. | The client's microprocessor or embedded controller. |

It is unclear whether Plaintiff disputes Defendants' construction because (1) Defendants construe the "associated client" to be the same client at which client attributes are sensed and to which messages are directed, whereas Plaintiff's construction allows attributes to be sensed at one client and then messages to be directed to a different client,[16] or (2) Plaintiff believes the "associated client" refers only to a component of that one client, not all of it. (*See* Pl's Br. at 18-19) In either case, the Court should adopt Defendants' construction because it springs directly from the claim language and is consistent with the prosecution history that led the inventors to add the word "associated" to claim 1, and because it avoids the ambiguity inherent in Plaintiff's construction.

Claim 1 recites a method that occurs in a "network comprising…one or more clients," with steps that occur with regard to *each client* included in the "one or more clients." (JA, Ex. A, 10:5-8 ("determining *for each client* one or more client attributes…"); 10:23 ("classifying *each client*…"); 10:25-28 ("directing…to *the one or more* clients classified…") (emphasis added)) In order to fall within the scope of claim 1, each step must occur with regard to a single client included in "the one or more clients" (though clearly the same steps can occur as to each of multiple clients in the network). As reflected in Defendants' construction, the language of claim

[16] Plaintiff has taken this position in its infringement contentions against at least General Motors.

1 dictates that the term "associated client" merely emphasizes that the sensor from which the client attribute information is obtained is a particular client sensor that is not only locally coupled to, but also physically embedded in or electronically integrated with, the same client for which the client attributes are being determined and to which the server sends a message.

Defendants' interpretation is supported by the prosecution history, which mandates that sensors be coupled locally to the client. The prosecution history reflects a series of rejections over prior art that forced the applicants to surrender considerable scope for what became claim 1. The following shows the limitations that were added to claim 1 during the prosecution of the patent (highlighted in underlined text):

> 1. In a network comprising a server coupled to one or more clients, a method for directed on-line commerce comprising the steps of:
>
> determining for each client one or more client attributes according to data received from one or more sensor interfaces, wherein the one or more client attributes determination is provided by a server, <u>at least one sensor interface electronically accessing one or more client sensor coupled locally to an associated client for real-time monitoring or configuration thereof, each associated client being coupled locally to a particular client sensor, such particular client sensor being physically embedded in or electronically integrated with its associated client, one or more client sensor physically detecting one or more client attribute, thereby enabling such client sensor automatically to generate an electronic digital feedback or control signal for real-time monitoring or configuration of such client sensor;</u>
>
> classifying each client into a first client set according to the determined one or more client attributes; and
>
> directing one or more messages in response to the set classification, wherein the directed one or more messages is provided by the server to the one or more clients classified into the first client set.

(JA, Ex. B at FH476)[17]

The applicants added the phrase "associated client" to overcome the Examiner's rejection

---

[17] Issued claim 1 corresponds to claim 21 in the original patent application. The above comparison shows the differences between claim 21 as originally submitted and issued claim 1.

of claim 1 over the prior art, (*id.*, Ex. B at FH227), and argued to distinguish that prior art because that reference used a "sensor" remotely located in a central server, as opposed to a "sensor coupled to associated client, such that the coupled sensor physically detects client attribute." (*Id.*, Ex. B at FH227) When the examiner maintained the rejection, the applicants further amended the claim "to clarify that each sensor is coupled 'locally' to *its* associated client for local detection of that particular client [sic] attributes" and emphasized the alleged novelty of "[l]ocal client-sensor coupling." (*Id.*, Ex. B at FH198 (emphasis added)) Consequently, the prosecution history requires that the "associated client" is the same client to which a particular client sensor is locally coupled, and for which client attributes are determined, as distinguished from all other clients included in the "one or more clients." *See, e.g.*, *Phillips*, 415 F.3d at 1317 (the prosecution history provides strong "evidence of how the PTO and the inventor understood the patent.").[18]

But now, for purposes of litigation, Plaintiff seeks to divorce the language of claim 1 from the specific meaning that the applicants gave it in order to gain allowance of the '899 patent. This is simply improper. *Norian Corp. v. Stryker Corp.*, 432 F.3d 1356, 1361-62 (Fed. Cir. 2005) (patentees are limited to the scope of what they ultimately claim, even if they "surrender more through amendment than may have been absolutely necessary to avoid particular prior art.").

---

18 Indeed, the examiner rejected the '899 patent over prior art when "Applicants recites [sic] 'coupled locally to an <u>associated</u> client' so that it could be a sensor locally associated with *any client*." (JA, Ex. B at FH162 (emphasis added)) In response, applicants told the examiner that their purported invention was different from the cited prior art because the sensors were coupled locally and not "accessible remotely to *another* client." (*Id.*, Ex. B at FH147 (emphasis added)) Similarly, when the Examiner rejected the '899 patent as invalid in light of the Hassett prior art reference, which "teaches each associated client being coupled locally to a particular client sensor" (*id*, Ex. B at FH121), the applicants never disputed this interpretation. (*See, e.g.*, *id*, Ex. B at FH102-103) Accordingly, the Examiner's Allowance relied on the same interpretation now proposed by Defendants.

In support of its construction, Plaintiff points only to specification citations that suggest the client of claim 1 includes or otherwise relies on a microprocessor or embedded controller (*see* Pl.'s Br. at 18)—neither of which Defendants dispute.[19] The problem with Plaintiff's proposed construction is that it can be read to imply that the "associated client" from which sensor data is obtained could be a different client than the one that is classified based on that information, and which then receives a corresponding directed message. But that is contrary to the intrinsic evidence, which dictates that the "associated client" is the same client (1) whose attributes are determined; (2) that receives the message from the server; (3) that is physically coupled to the sensor; and (4) in which the sensor is physically embedded or electronically integrated.[20]

The "associated client" is "the client" that is recited throughout the entirety of claim 1. It is not a subcomponent of that client. It is not some other client. The word "associated" simply clarifies that the client is "associated" with the sensor to which it is coupled. The "association" is between the client and the sensor. It is not an "association" between two different clients, or between two different components within the same client.

**F. <u>"Real-time Configuration"</u>**

| Claim Language | Defendants | Plaintiff |
|---|---|---|
| one or more client sensor physically detecting one or more client attribute, thereby enabling such client sensor automatically to generate an electronic digital feedback or control signal for ***real-time*** monitoring or | The claim term is indefinite. | The functional arrangement. |

---

19 These disclosures are fully consistent with Defendants' construction of "client" as comprising a computer, since one would expect a computer to include a microprocessor or embedded controller.

20 Specifically, a closer look at Plaintiff's proposed construction, in connection with its proposed construction of "one or more clients" and its infringement contentions, reveals that Plaintiff attempts to broaden claim 1 to allow for the "associated client" to be something other than the single client that claim 1 mandates satisfies all four of the recited features identified above. (*See, e.g.*, Pl.'s Br. at 23 ("It is the associated client which is coupled locally to the sensor, not the client."))

| | | |
|---|---|---|
| ***configuration*** of such client sensor; | | |

Plaintiff's proposed construction ignores a fatal deficiency affecting all of the claims of the '899 patent: the phrase "real-time configuration" violates the definiteness requirement of 35 U.S.C. § 112, ¶ 2 because the term fails to provide notice to a skilled artisan of the scope of the purported invention.

The '899 patent provides no guidance on the meaning of "real-time configuration." Indeed, the phrase "real-time…configuration" appears only in the claims. To the extent the specification uses one part of this phrase, it nonetheless fails to precisely explain the bounds of the invention as claimed. Plaintiff implicitly admits the indefiniteness of this term by failing to identify anything from the specification or the prosecution history that sheds any light on its meaning. In short, the '899 patent fails to provide any objective standard by which to determine the scope of the claimed invention, and it thus fails to provide fair notice to the public. *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005) ("A purely subjective construction of 'aesthetically pleasing' would not notify the public of the patentee's right to exclude since the meaning of the claim language would depend on the unpredictable vagaries of any one person's opinion of the aesthetics of interface screens. While beauty is in the eye of the beholder, a claim term, to be definite, requires an objective anchor."). This insoluble ambiguity renders the asserted claims 1-4, 7, and 8 of the '899 patent indefinite, and thus invalid.[21]

In an effort to overcome this deficiency, Plaintiff arbitrarily chooses a dictionary definition that is neither supported by the '899 patent specification nor consistent with the language of the claims themselves. Plaintiff's sole citation to the specification both fails to refer

[21] The resolution of issues of claim indefiniteness is part of the Court's role as construer of patent claims. *Datamize*, 417 F.3d at 1347.

to the term in dispute or any similar phrase, and fails to discuss the functional arrangement of any aspect of the purported invention. (JA, Ex. A, 5:34-39)

In sum, Plaintiff's construction exemplifies another improper attempt to re-write claim 1 to cure the indefiniteness deficiency. Accordingly, the Court should not adopt Plaintiff's unsupported construction, but should instead find that the phrase "real-time configuration" and the asserted claims 1-4, 7, and 8 are indefinite.

### G. "Electronic Digital Feedback or Control Signal" (Claim 1)

| Claim Language | Defendants | Plaintiff |
|---|---|---|
| one or more client sensor physically detecting one or more client attribute, thereby enabling such client sensor automatically to generate an ***electronic digital feedback or control signal*** for real-time monitoring or configuration of such client sensor; | An electronic digital signal relayed to the server based on the detection of a client attribute, enabling the server to monitor or control the client. | An electronic digital feedback or control signal relayed to the server by the client sensor based on the detection of a client attribute, enabling the server to monitor or configure the client. |

The dispute between the parties appears simple, yet it is fundamental. Indeed, every single word of the Defendants' construction is included in Plaintiff's, except for the word "control." However, Plaintiff has added unnecessary complexity to the construction by proposing a definition using the very words being defined, in addition to the ambiguous term "configure."

Defendants' construction, first and foremost, is supported by the language of the claims themselves.[22] "Electronic digital signal" is a phrase that can be readily understood by persons of skill in the art and has a readily apparent meaning to lay judges and jurors. *Phillips*, 415 F.3d at 1314. As the language of claim 1 dictates, such a signal is relayed to the server based on the detection of a client attribute. (*See* JA, Ex. A, 10:18-28 ("one or more client sensor physically

22 Indeed, the claims are the only place in the '899 patent where the phrase "electronic digital feedback or control signal" appears.

*detecting one or more client attribute*, thereby enabling such client sensor automatically to generate an electronic digital feedback or control signal for real-time *monitoring* or configuration of such client sensor; classifying each client into a first client set according to the determined one or client attributes; and directing one or more messages in response to the set classification, wherein the directed one or more messages is *provided by the server to the one or more clients* classified into the first client set") (emphases added))[23] In turn, this signal allows the server to monitor or control the client. (*See id.*) Defendants' use of the word "control" in their construction is not only proper, but also well-supported: the plain and ordinary meaning of the phrase in dispute (*i.e.*, "electronic digital feedback or control signal") in the specific context of claim 1 requires that the signal enables control of the client. (*See, e.g.*, JA, Ex. A, 5:34-45)

Although Plaintiff's proposal uses some of the words of claim 1, it fails to further elucidate the meaning of the claim term. (Pl.'s Br. at 20) As a result of using the words "electronic digital feedback or control signal" and "configure" to define "electronic digital feedback or control signal," Plaintiff's proposal will only confuse the jurors and complicate the issues. The ambiguity in Plaintiff's proposal is exacerbated by use of the word "configure," which as explained above is incapable of being construed in the context of the asserted patent claims, and thus is indefinite.

### H. "Messages" (Claim 1)

| Claim Language | Defendants | Plaintiff |
|---|---|---|
| directing one or more ***messages*** in response to the set | Communications whose content is commercial, | Communications whose content is commercial, |

[23] Defendants maintain that "real-time configuration" is indefinite. However, because "real-time monitoring" is definable and the phrase in dispute dictates that a signal is used to control the client, Defendants propose a construction for "electronic digital feedback or control signal," a phrase that necessarily relies on "real-time monitoring" or "real-time configuration" per the claim language. Indeed, Plaintiff implicitly admits the correctness of the use of "control," when it relies on the word "controls" to support its own construction of "configuration." (Pl.'s Br. at 20)

| | | |
|---|---|---|
| classification, wherein the directed one or more messages is provided by the server to the one or more clients classified in the first client set. | promotional or marketing <u>in nature, in the form of</u> symbol, audio, text, still image, video, or other media content or signal. | promotional or marketing symbol, audio, text, still image, video, or other media content or signal. |

The parties' proposals are identical except for the underlined language in Defendants' construction above, which is necessary to make clear that the content of the communications is commercial, promotional or marketing <u>in nature</u>, *and* that such communications are <u>in the form of</u> symbol, audio, text, still image, video, or other media content or signal.

Plaintiff does not dispute that the nature of the claimed message's content is commercial, promotional or marketing, nor does it dispute that the form of the message is a symbol, audio, text, still image, video, or other media content or signal. Instead, Plaintiff offers a construction that makes no sense, justifying it on the basis that the language is copied from the '899 specification. (Pl's Br. at 21-22) There is no reason to repeat grammatical errors, ambiguities, or nonsensical phrasing simply because they originate in the specification. The point of claim construction is to make sense of the disputed term, so that the jury will be able to apply it to the accused product or prior art. *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004). Plaintiff's construction does not make sense; Defendants' does, and it should be adopted.

## I. <u>"Directing One or More Messages…" (Claim 1)</u>

| Claim Language | Defendants | Plaintiff |
|---|---|---|
| ***directing one or more messages in response to the set classification, wherein the directed one or more messages is provided by the server to the one or more clients classified in the first client set.*** | In response to a client being assigned to the classified set, the server selects and downloads a message through an on-line network to every client in that set. | In response to a client being assigned to the classified set, the server generates and/or sources one or more messages through an on-line network to designated clients within each client set. |

This disputed term reflects the very heart of the alleged invention. (*See* JA, Ex. A, 1:33-35) The parties' constructions differ in two key respects. First, Defendants require that the

server "selects and downloads" a message, whereas Plaintiff requires that the server "generates and/or sources" the message. Second, Defendants require that the message be sent to every client in the set to which the client is assigned, whereas Plaintiff requires that the message be sent to "designated clients within each client set."[24] Defendants' construction is more consistent with the claim language and the specification of the '899 patent.

### 1. <u>The Server Selects and Downloads the Message</u>

The first issue to be resolved by the Court is what it means for the server to "direct" a message to a client. The word "direct" does not appear to have an ordinary meaning relevant to its use in claim 1, the specification does not expressly define it, and Plaintiff does not suggest it is a term of art. However, from its use in the specification, it is apparent that "directing" a message includes two aspects: (1) associating a message with a classified client, based on that client's sensed attributes, and (2) sending the message to the client:

> In accordance with present invention, network 4, including server(s) 2 and client(s) 10, 20, 30 employ software and/or other functionally equivalent firmware, hardware, or electronics for directing or targeting on-line messages or electronic signals to selected or classified client set or group adaptively or dynamically according to monitored or specified set characteristics or attributes.

(JA, Ex. A, 2:28-34) Defendants' construction encompasses both aspects by requiring that the message be "selected" and "downloaded," in keeping with the inventors' own description.

Plaintiff's construction, which requires that the server "generates and/or sources" a message, will not only prove difficult for a jury to understand and apply (*e.g.*, What does it mean to *source* a message?), but also fails to accurately reflect the very disclosure on which Plaintiff purports to rely:

---

[24] In addition, Defendants' proposed construction refers to "*a* message," while Plaintiff's refers to "*one or more* messages." The difference is inconsequential. Defendants' construction reflects the minimum number of messages necessary to fall within the claim (*i.e.*, one) and plainly does not preclude multiple messages. Defendants' approach is simply more jury friendly.

> FIG. 7 flow chart shows directed offering transaction operation 90, wherein subject server 2 (or alternate network processor) generates and/or sources one or more directed or targeted message, which may in include commercial, promotional, or marketing symbol, audio, text, still image, video or other media content or signal for context-mapped or other designated clients within specified grouping(s). In particular, such directed messages may be downloaded from module 102, or other network source, and transmitted 92 through network 4 to designated client sites according to database 100 user client and grouping configurations and network connections specified in module 104…

(*Id.*, Ex. A at 9:18-31) This disclosure reflects both aspects of "directing" (albeit using "downloading" with reference to the first aspect and "transmitting" with reference to the second), whereas Plaintiff's construction appears to address only how a message is created.[25]

### 2. <u>The Server Directs the Message to Every Client in the Set</u>

The second issue to be resolved is whether the server sends the selected message to every client in a classified set of clients, as Defendants propose, or only to "designated clients within each client set," as Plaintiff proposes. Defendants' construction comes directly from the claim language, which requires directing one or more messages "to the one or more clients classified into *the* client set." (*Id.*, Ex. A at 10:25-28 (emphasis added)) By contrast, the reference to "each client set" in Plaintiff's proposal finds no support in the claim. Claim 1 requires that each of "one or more clients" is classified into "a first client set." (*Id.*, Ex. A at 10:23-24) The claim then recites directing at least one message "to *the* one or more clients classified into *the* first client set," plainly referring back to the earlier claim language. (*Id.*, Ex. A at 10:26-29) Thus, regardless of how many clients are classified in "the first client set," the claim expressly requires that the message be directed to every client in that set.

---

[25] Plaintiff's construction appears to be aimed at encompassing an implementation where the server dynamically creates a message in response to a client being classified. However, the portion of the specification on which Plaintiff relies refers only to downloading an existing message stored in a database (*i.e.*, module 102 of database 100, as shown in Figure 3 of the patent) or some unspecified "other network source."

Beginning with the Summary of Invention, which characterizes the patented invention as "software for directing on-line messages to classified client set," the specification of the '899 patent fully supports Defendants' construction. For instance, the patent teaches that client *sets*, not "designated" clients, are associated with targeted on-line messages. (*Id.*, Ex. A at 2:52-55, 3:9-12) Likewise, the patent explains that a "subject client may be classified in a set according to subject attribute (*i.e.*, currently monitored or generated attribute signal); then, a message or transaction signal representative thereof is sent to clients classified in that set." (*Id.*, Ex. A at 3:15-21)

Notwithstanding the lack of ambiguity in the claim language, Plaintiff suggests that the limitation should be construed to permit a message to be directed to only "designated clients" within each of one or more client sets. (Pl's Br. at 22-23) Yet the portions of the specification on which Plaintiff relies are not supportive. In particular, Plaintiff points to a statement that "directed messages may be downloaded…and transmitted 92 through network 4 to designated client sites according to database 100 user client and grouping configurations," but that statement does not say that messages may be downloaded and transmitted to only a subset of the clients in a given classified set. (*See* JA, Ex. A at 9:24-28) A more natural reading is that the "designated client sites" *are* the clients in the classified set, "designated" from among the entire collection of clients in the network.[26]

---

[26] Plaintiff also cites a statement in the prosecution history that "message may be sent to any client classified in sets based on client sensor data." That statement, made in connection with an argument about sensors, is at best ambiguous, but in any event is trumped by a far more revealing statement in the same document. There, the applicants summarized their invention as "a method for sending messages adaptively in a client-server network *to clients classified in a set* using attributes determined specifically from sensor data." (JA, Ex. B. at FH025 (emphasis added) and FH028)

### J. "The One or More Clients" (Claim 1)

| Claim Language | Defendants | Plaintiff |
|---|---|---|
| directing one or more messages in response to the set classification, wherein the directed one or more messages is provided by the server to ***the one or more clients*** classified in the first client set. | This includes at least the same client to which the sensor is coupled locally and for which an attribute is determined. | This includes at least the same client for which an attribute is determined. |

The parties' dispute over the phrase "the one or more clients" in claim 1 collapses to the same issue addressed above with respect to "associated client," namely, whether the client must be locally coupled to the client sensor. The parties agree that the phrase "the one or more clients" must include "at least the same client for which an attribute is determined," but disagree as to whether that client for which an attribute is determined must also be coupled locally to the client sensor. (*See, e.g.*, Pl.'s Br. at 23)

As explained above in Section E, Defendants contend that the terms "client" and "associated client" in claim 1 refer to the same, particular client (or clients, in the case of "or more clients"). Accordingly, for the same reasons set forth in Section E above, this Court should adopt Defendants' construction.

### K. "Interface Receiving First Network Signal…" (Claim 7)

| Claim Language | Defendants | Plaintiff |
|---|---|---|
| the interface receiving first network signal according to the classified set | The client interface receives a message through the network from the server, the message having been selected and downloaded by the server based on the classification of the client interface. | The client interface receives a network signal through the network from the server, the network signal having been generated and/or sourced by the server based on the classification of the client interface. |

Read in context, this disputed term effectively recites the same functionality as the "directing one or more messages" limitation in claim 1 discussed above, only from the perspective of a client receiving a transmission from a server. As with claim 1, the parties

dispute whether what is received by the client is "selected and downloaded" or "generated and/or sourced" by the server. In addition, the parties dispute whether the received "network signal" should be construed to mean a "message," as that term is used throughout the '899 patent.

For the same reasons discussed in Section I, above, Defendants submit that the specification requires that the signal transmitted to the client interface "according to the classified set" is one that is "selected and downloaded" from the server, not "generated and/or sourced" as Plaintiff proposes.

As for whether the transmitted signal must be a "message," Plaintiff's effort to avoid any limitation on the scope of the "network signal" in claim 7 ignores repeated concessions in the specification and prosecution history regarding the nature of the patented invention. The specification states in no uncertain terms that *the invention*, not just a preferred embodiment, "resides in software for directing on-line *messages* to classified client set." (JA, Ex. A at 1:33-35 (emphasis added)) Likewise, the applicants told the Patent Office that "*[t]he invention* is a method for sending *messages* adaptively in a client-server network to clients classified in a set …" (*Id.*, Ex. B at FH025 (emphasis added)) The fact that claim 7 uses the term "network signal" instead of "message" cannot change the nature of the invention.

In the context of the '899 patent, the "network signal" recited in claim 7 is simply an electronic representation of a message. Indeed, the specification of the '899 patent routinely commingles the terms "message" and "signal." (*See, e.g.*, JA, Ex. A, 2:31-32 ("on-line messages or electronic signals"), 2:54-55 ("on-line message or electronic network signals"), 3:11-12 ("directed transactions, messages, or signals representative thereof"), 3:12-13 ("directed message, transaction or network signal"), 3:19-20 ("message or transaction signal"), 12:19-20 ("message signal")) Nothing in the '899 patent suggests that the inventors intended the terms to

have different meanings or scope.

In urging the omission of any reference to a "message" from the construction of "the interface receiving first network signal…" limitation, Plaintiff contends that "[w]hile a 'network signal' may be a type of message, a message is not limited to being a network signal," citing as support a phrase in the specification that does not even mention the term "network signal." (*See* Pl's Br. at 24 (citing JA, Ex. A, 9:21-24 ("directed or targeted message, which may include commercial, promotional, or marketing symbol, audio, text, still image, video or other content or signal"))) Somewhat confusingly, Plaintiff appears to be suggesting that the term "network signal" is somehow narrower than the term "message," but this cannot be the case absent some express definition in the specification, of which there is none. The term "network signal" viewed in a vacuum would be much *broader* than "message," in that it would theoretically encompass any and all signals transmitted over a network. But that is not what the applicants claim to have invented, and for that reason the term "network signal" in claim 7 cannot be construed so broadly.

## IV. CONCLUSION

For the foregoing reasons, Defendants respectfully submit that their proposed constructions for the disputed terms in the claims of the '899 patent should be adopted by the Court, along with the constructions on which the parties previously agreed.

January 18, 2008

Respectfully submitted,

/s/ Lydia E.Wahlke
John T. Hickey, Jr., P.C.
Craig D. Leavell
Tiffany P. Cunningham
Lydia E. Wahlke
KIRKLAND & ELLIS LLP
200 E. Randolph Drive
Chicago, Illinois 60601
jhickey@kirkland.com
cleavell@kirkland.com
tcunningham@kirkland.com
lwahlke@kirkland.com
*Counsel for Defendants General Motors Corporation, OnStar Corporation, and Toyota Motor Sales USA, Inc.*

/s/ Mark M. Supko *(by permission)*
David M. Schnorrenberg
Mark M. Supko
Mark H. Neblett
Eva U. Gunasekera
Jeffrey D. Sanok
CROWELL & MORING
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Fax 02.628.5116
dschnorrenberg@crowell.com
msupko@crowell.com
mneblett@crowell.com
egunasekera@crowell.com
jsanok@crowell.com

Robin Korman Powers
Kenneth P. Taube
ROTHSCHILD, BARRY & MYERS, P.C.
55 West Monroe Street
Xerox Centre, Suite 3900
Chicago, IL 60603
Fax 312.372.2350
powers@rbmchicago.com
taubek@rbmchicago.com
*Counsel for Defendants Mercedes-Benz USA, LLC and BMW North America, LLC*

/s/ Stacie R. Hartman *(by permission)*
Stacie R. Hartman
Richard J. Hoskins
David C. Scott
SCHIFF HARDIN LLP
6600 Sears Tower
Chicago, IL 60606-6473
Fax 312.258.5600
shartman@schiffhardin.com
rhoskins@schiffhardin.com
dscott@schiffhardin.com
*Counsel for Defendant @Road, Inc.*

/s/ John Flock *(by permission)*
John Flock
Thomas R. Makin
Kevin J. Prey
KENYON & KENYON LLP
One Broadway
New York, NY 10004-1007
jflock@kenyon.com
tmakin@kenyon.com
kprey@kenyon.com
*Counsel for Defendant Toyota Motor Sales USA, Inc.*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on January 18, 2008, I caused the foregoing DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF to be served on counsel of record via the Electronic Court Filing ("ECF") system, in compliance with the Federal Rules of Civil Procedure and the Local Rules of this Court:

Paul K. Vickrey
Richard B. Megley, Jr.
Kara L. Szpondowski
NIRO, SCAVONE, HALLER & NIRO, LTD.
181 West Madison Street, Suite 4600
Chicago, Illinois 60602-4515
Fax 312.236.3137
pvickrey@nshn.com
szpondowski@nshn.com

Stacie R. Hartman
Richard J. Hoskins
David C. Scott
SCHIFF HARDIN LLP
6600 Sears Tower
Chicago, IL 60606-6473
Fax 312.258.5600
shartman@schiffhardin.com
rhoskins@schiffhardin.com
dscott@schiffhardin.com

David M. Schnorrenberg
Mark M. Supko
Mark H. Neblett
Eva U. Gunasekera
Jeffrey D. Sanok
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Fax 02.628.5116
dschnorrenberg@crowell.com
msupko@crowell.com
mneblett@crowell.com
egunasekera@crowell.com
jsanok@crowell.com

John T. Hickey, Jr., P.C.
Craig D. Leavell
Tiffany P. Cunningham
Lydia E. Wahlke
KIRKLAND & ELLIS LLP
200 E. Randolph Drive
Chicago, Illinois 60601
jhickey@kirkland.com
cleavell@kirkland.com
tcunningham@kirkland.com
lwahlke@kirkland.com

Robin Korman Powers
Kenneth P. Taube
ROTHSCHILD, BARRY & MYERS, P.C.
55 West Monroe Street
Xerox Centre, Suite 3900
Chicago, IL 60603
Fax 312.372.2350
powers@rbmchicago.com
taubek@rbmchicago.com

John Flock
Thomas R. Makin
Kevin J. Prey
KENYON & KENYON LLP
One Broadway
New York, NY 10004-1007
jflock@kenyon.com
tmakin@kenyon.com
kprey@kenyon.com

/s/ Lydia E. Wahlke
*Counsel for Defendants General Motors Corporation, OnStar Corporation, and Toyota Motor Sales USA, Inc.*