**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PLAINTIFF INNOVATIVE TECHNOLOGIES, L.L.C., | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 07 CV 1397 |
| GENERAL MOTORS CORPORATION; ONSTAR CORPORATION; MERCEDES-BENZ, U.S.A., L.L.C.; TOYOTA MOTOR SALES, U.S.A., INC.; BMW OF NORTH AMERICA, L.L.C., | ) | Judge Virginia Kendall<br>Magistrate Judge Maria Valdez |
| Defendants. | ) | |

**ONSTAR AND GM'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL**

This row is solely about Plaintiff's refusal to have its expert comply with the Joint Stipulation entered by the Court, and, despite Plaintiff's characterizations to the contrary, concerns only documents already produced by OnStar and GM. Under the Order, OnStar established a Reading Room. Plaintiff has sent visitors to the reading room twice. The first visit was by an attorney unassociated in any manner with this case and Plaintiff's expert, neither of which had read or agreed to follow the terms of the Joint Stipulation. The second visit was by Plaintiff's attorney and a paralegal with no apparent training or skill in the subject matter of this case. Plaintiff's motion concerns 700 documents selected during the second visit. Plaintiff admits that these documents contain highly sensitive material that has no relevance to this case.

Plaintiff filed its motion to compel on Tuesday, March 31, 2008, less than twenty-four hours after requesting a meet-and-confer, and while counsel for OnStar Corporation and General

Motors was in California taking the deposition of co-inventor Irene Y. Hu. This meet-and-confer has not yet occurred, and Plaintiff's motion is premature and improper under both the local rules and common courtesy.

Plaintiff's motion relates to documents that have been produced months ago in accordance with this Court's order and have been made available in their entirety to Plaintiff. Neither General Motors Corporation nor OnStar Corporation (collectively, "OnStar") has ever refused to make technical information available to Plaintiff, whether via document production, permitting inspection and pursuant to Rule 34, or agreed formats pursuant to the Joint Stipulation entered by this Court. OnStar even proposed a compromise to settle this dispute, and as of this filing, that compromise is ***still on the table***, with no response from Plaintiff. In contrast, Plaintiff's motion paints a self-serving, parade of horribles that mischaracterizes a relatively simple issue.

## FACTUAL BACKGROUND

OnStar has produced the documents sought by Plaintiff. OnStar has fully complied with its discovery obligations, yet, Plaintiff continues to protest simply because the production is not in the exact manner that Plaintiff now desires — even though this manner is not as this Court ordered pursuant to both parties' request. Plaintiff seeks a different manner of production for highly sensitive information that relates to consumer automotive safety and security systems and demands inclusion of information that Plaintiff admits ***is not relevant to this case.*** (Pl.'s Br. at 9.)

### A. OnStar's Technical Specifications

OnStar is a vehicle safety, security, and information system created to provide safety, security and convenience features to occupants of vehicles by using Global Positioning System (GPS) and cellular technology to link a vehicle and driver to an OnStar call center that offers

personalized help 24 hours a day. (Ex. 1, Decl. S. Schwinke ¶ 5.) OnStar began offering its services in 1996 (more than two years before Plaintiff's alleged invention date) for purchasers of certain 1997 Model Year GM vehicles and now serves millions of subscribers. (*Id.* ¶ 6.)

Since before Dennis Fernandez admits hearing of OnStar, OnStar has utilized proprietary over-the-air commands or codes for remotely actuating certain vehicle functions. (Ex. 1, Decl. S. Schwinke ¶ 9.) These codes enable a variety of safety and security measures, including location assistance, accident notification through calls triggered by a vehicle airbag deployment or crash, facilitation and triage of emergency calls, and remote operation of various vehicle functions including door locks, lights, and horn. *Id.* ¶ 10

The documents at issue cover OnStar's specifications that embody the OnStar Air Interface communications protocols. OnStar maintains a number of technical specifications and related documents that detail the operations of the in-vehicle hardware and communications protocols that govern remote communications in connection with OnStar services. (Ex. 1, Decl. S. Schwinke ¶ 7.) The OnStar Technical Specifications ("OTS") and Air Interface Specifications ("AIS") are extremely sensitive proprietary, trade secret and confidential business information of OnStar. (*Id.* ¶¶ 9-10.) More importantly, the OTS and AIS contain the highly secret Air Interface command codes ("Air Interface codes", or "AIF codes") and sequencing that allow an operator to communicate with and issue commands remotely to an OnStar equipped vehicle. (*Id.* ¶ 9.)

Because the OnStar System remotely accesses a vehicle's locks and safety communications, while also providing the ability to detect a vehicle's location, it is of critical importance to the safety and privacy of OnStar subscribers that the security of the OTS and AIS be protected to prevent unauthorized access. (Ex. 1, Decl. S. Schwinke ¶ 10.) OnStar secures the

OTS and AIS in a variety of ways to ensure that safety and security features provided by the OnStar service cannot be disrupted or accessed by third parties with malicious intent. *Id.* One of the methods by which OnStar ensures security of the service is to closely guard and protect the OTS and AIS. *Id.*

The danger from unauthorized access to these codes is not just competitive harm from disclosure of confidential and valuable trade secret information; what is at stake is the safety and security of OnStar's subscribers. (Ex. 1, Decl. S. Schwinke ¶¶ 9, 11.) If disclosed — even inadvertently — to an individual with malicious intent, the OTS and/or AIS could be used in a manner that would result in dramatic and dangerous consequences to the safety and security of those in and around vehicles using the OnStar service. Those consequences include:

- disrupting communications for emergency services, potentially inhibiting assistance from OnStar or emergency service providers to drivers in emergencies;
- allowing or creating network attacks on OnStar vehicles or on OnStar;
- unauthorized tracking of individuals in their vehicles;
- unauthorized remote door unlocks that could enable car jacking or theft;
- nuisance attacks on vehicles, such as remotely commanding horn activations, or other actions taking place in vehicles while they are in operation; and
- attacks on other controls that actively interfere with the operation or drivability of a vehicle.

*Id.* ¶ 11. In the wrong hands, certain information contained in OTS and AIS could be used to cause harm to the OnStar service's more than five million active subscribers. (*Id. at* ¶ 12.)

Importantly, these codes are ***not relevant*** to this case, as Plaintiff admits.[1] These codes can be redacted without affecting Plaintiff's understanding of the overall functionality of the

[1] "Indeed, Plaintiff does not dispute that completely unrelated information to this lawsuit (*i.e.* the internal GM/OnStar 'codes' in the source code) may be redacted." (Pl.'s Br. at 9.)

OnStar system. In addition, many of these codes relate to features that are not at issue in this case, such as remote door unlocking.[2] These codes can be redacted, but as they are spread throughout voluminous documents, it is costly and time-consuming to redact these codes. Accordingly, OnStar has timely produced these documents in a Reading Room that meets the orders in this case and complies with the Federal Rules of Civil Procedure by balancing the safety and security of OnStar's subscribers with Plaintiff's needs.

**B. The Parties' Joint Stipulation on Discovery**

OnStar, along with the other defendants, proposed a joint stipulation on discovery to Plaintiff with the goal of preventing discovery issues such as the instant dispute. Plaintiff agreed to the joint stipulation, which was entered by the Court on November 29, 2007. The relevant paragraph of the Joint Stipulation, Paragraph 11, provides in full:

> 11. The parties have further agreed that highly confidential electronically-stored information, ***including, but not limited to, communications protocols and source code***, ("Source Code"), will be made available for inspection and that such inspection may be conducted by no more than two members of outside counsel of each party and one independent consultant, at a time and place mutually convenient to both the producing and requesting party, on a closed-circuit computer system with no internet access (the "Reading Room"). The Reading room will be provisioned with sufficient tools to review the Source Code and to allow printouts to be made of ***relevant Source Code excerpts***. Such printouts will be left with the Reading Room so that the producing party can number, designate as "HIGHLY CONFIDENTIAL" pursuant to the stipulated protective order, and produce such printouts to the requesting party's outside counsel promptly. The parties further agree that neither Dennis S. Fernandez nor any employee, member, or associate of Fernandez & Associates, LLC will qualify as either "outside counsel" or an independent consultant.

(Dkt 103 (emphasis added)). This language is unambiguous and clearly conveys the parties'

---

2 The Remote Door Unlock feature has never been accused by Plaintiff. Indeed, because this feature was offered for sale in 1996, Plaintiff *cannot* accuse this feature without admitting that the '899 patent is invalid. *See Evans Cooling Sys., Inc. v. General Motors Corp.*, 125 F.3d 1448, 1451 (Fed. Cir. 1997)

agreement to narrow the disclosure to ***relevant excerpts***. This very language was proposed in a compromise to Counsel for Plaintiff and accepted by Counsel for Plaintiff. (Ex. 2, 11/13/2007 email K. Szpondowski to L. Wahlke at 2.) OnStar has always interpreted Source Code, as defined by the joint stipulation, to include both the OTS and the AIS — the technical specifications that embody OnStar's communication protocols.

### C. The OnStar / General Motors Reading Room

To enable Plaintiff to access, review, and analyze relevant Source Code, OnStar at great cost (approximately $50,000), contracted with independent, third party consultants to prepare a Reading Room pursuant to the Joint Stipulation. The Reading Room contains two computers holding relevant Source Code and equipped with a full-text "Google" search capability. The Reading Room fully meets its purpose – it is an accommodation for visitors to perform the act of reading, review, and analysis. For each visit, the Reading Room has been capable of printing relevant excerpts of documents designated by counsel for Plaintiff. At no time prior to signing the Joint Stipulation did Plaintiff advise OnStar of specific requests regarding the Reading Room, other than "having a paper or electronic copy of any relevant algorithms, functions, procedures, etc.". (Ex. 2, 11/13/2007 email K. Szpondowski to L. Wahlke at 4.) In addition, OnStar placed no limits on the number of times that counsel for Plaintiff may visit the Reading Room.

### D. Plaintiff's refusal to search documents during the first visit to the OnStar/GM reading room on February 26, 2008

Two days before the *Markman* hearing in this case, Plaintiff sent to the Reading Room Mr. Jay Kesan, an attorney with no apparent connection to this case or Plaintiff's counsel *Niro, Scavone, Haller & Niro,* and Mr. Regis Bates, Plaintiff's designated consultant. (Ex. 3, 2/21/08 email K. Szpondowski to L. Wahlke.) Neither Mr. Bates nor Mr. Kesan had read the Court's

previous discovery order or were prepared to meet the obligations imposed by that order.

These gentleman arrived hours late to begin the review. (Ex. 4, 2/26/08 email K. Szpondowski to E. Siegel.) Shortly after arriving, Mr. Kesan objected to the setup and procedures of the room. (Ex. 5, Decl. of E. Siegel ¶ 4.) At a meeting with Edward Siegel, outside counsel for OnStar, and Timothy Marsh, in-house counsel for OnStar, Mr. Kesan complained that he had expected to identify potentially hundreds, if not thousands, of documents for printing in their entirety, and that the present print process was too burdensome. (Ex. 5, Decl. of E. Siegel ¶ 7.) Messrs. Marsh and Siegel explained that under the Joint Stipulation, the Reading Room was designed to allow counsel (and, more importantly, counsel's technical experts, who are presumably able to efficiently and succinctly identify the materials they wish to review and rely upon) to print relevant excerpts of Source Code, not necessarily entire documents. *Id.* Mr. Kesan admitted that he had not read either the Joint Stipulation or Agreed Protective Order and was unfamiliar with the agreement between the parties. (Ex. 5, Decl. of E. Siegel ¶ 7.) During this meeting on the initial visit, Mr. Kesan identified two alleged concerns, both of which are repeated in Plaintiff's brief.

Plaintiff's first apparent concern is *"The computers [in the Reading Room] were not identical."* (Pl.'s Br. at 4 (emphasis added).) Upon Mr. Kesan and Mr. Bates conducting an identical search on their respective computers, (for the search term "zip"), there was a difference in the search results between the two computers. OnStar's independent consultants have since determined that the reason Mr. Kesan's computer did not give the same search results was that the Google indexing process was still running on his computer during the time their searches took place. (Ex. 5, Decl. of E. Siegel, at ¶ 5.) This also explained why Mr. Kesan's computer was slower to return search results than Mr. Bates's computer, because computer memory was

occupied by the indexing process. (Ex. 5, Decl. of E. Siegel, at ¶ 5.) In fact, ***this issue was immediately resolved the next day*** simply through the passage of time, which allowed the Google indexing to complete on this second computer.

Plaintiff's second apparent concern is *"Plaintiff's reps could not designate for printing any file or page of a file."* (Pl.'s Br. at 5 (emphasis added).) ***This statement by both counsel for Plaintiff and Mr. Kesan is not true.*** Even during the visit by Mr. Kesan, many documents could be designated for printing. (Ex. 5, Decl. of E. Siegel, at ¶ 6.) For some types of documents, the file name would have to be handwritten on a piece of paper and printed separately by the independent consultant. (Ex. 5, Decl. of E. Siegel, at ¶ 6.) During the meeting with Messrs. Marsh and Siegel, it was explained to Mr. Kesan that the print process (recording file name and desired page numbers) was reasonable for the agreed upon activities (*i.e.*, designating select portions of documents for printing after an intelligent review of those documents). (Ex. 5, Decl. of E. Siegel, at ¶ 7.)

At the end of this meeting, Mr. Kesan left with Mr. Bates and refused Mr. Marsh's offer to return for the remaining days of the Reading Room review. (Ex. 5, Decl. of E. Siegel, at ¶ 7.) Following this meeting, and even though not required by the parties' stipulation, OnStar's consultant worked to resolve each of the concerns expressed by Mr. Kesan. (Ex. 5, Decl. of E. Siegel, at ¶ 8.) The indexing issue was discovered, diagnosed, and resolved, and tests were performed to ensure that both computers provided the same results for all queries, including the search that gave different results during Mr. Kesan's visit, *i.e.*, search term "zip." (Ex. 5, Decl. of E. Siegel, at ¶ 8.) OnStar's consultant also wrote ***new software*** to allow counsel for Plaintiff to designate all documents for printing without writing filenames. (Ex. 5, Decl. of E. Siegel, at ¶ 8.)

Following the deposition of Dennis Fernandez, the parties met and conferred in advance of Plaintiff's second visit to the Reading Room. (Ex. 6, 3/13/08 Ltr. L. Wahlke to K. Szpondowski.) During this meet and confer, counsel for OnStar noted that each of Mr. Kesan's concerns had been resolved. (*Id*.) Finally, concerned that Plaintiff had previously sent counsel with no apparent connection to this case and no familiarity with the Joint Stipulation, OnStar requested that counsel for Plaintiff adhere to the joint Stipulation on future visits by sending "two members of outside counsel of each party and one independent consultant." (Ex. 7, email chain between E. Siegel and K. Szpondowski; Ex. 6, 3/13/08 Ltr. L. Wahlke to K. Szpondowski.)

**E. Plaintiff's second reading room visit on March 18-20, 2008, without expert witnesses.**

Following the meet and confer, counsel for Plaintiff, Ms. Szpondowski, scheduled a visit to the Reading Room and requested that OnStar allow a paralegal, with no apparent technical training or skill relevant to the issues of this case, to attend to assist her in searching for documents. (Ex. 8, 3/17/08 email chain between L. Wahlke and K. Spondowski.) Even though this was not the parties' previous agreement, as embodied in the Joint Stipulation, OnStar made an exception as a courtesy. *Id.* Counsel for Plaintiff (Ms. Szpondowski) did not, however, bring an expert consultant to assist with the search.

During the visit, a project assistant from Kirkland & Ellis LLP, who was not assigned to this case, attended the Reading Room to facilitate communication with OnStar personnel. Contrary to Plaintiff's suggestion, a Kirkland & Ellis associate was not present during this visit. During the search, Ms. Szpondowski met with Mr. Marsh, who notified her that it would take longer to produce any files designated for production as GM would need to review the totality of her selections to verify the documents did not constitute more than an "excerpt." At that time,

Ms. Szpondowski expressed her understanding and agreement with GM's need to review her selections.

Following Ms. Szpondowski's visit, OnStar discovered that Ms. Szpondowksi and her paralegal had designated over 17,000 pages representing some 700 documents, many of which contain AIF codes that require redaction and most of which appear to be complete documents, not excerpts.

Plaintiff agrees that OnStar's highly confidential and proprietary information contained within its communication protocols is not relevant to this case and should be redacted.[3] Because redacting so much information would require a great deal of cost and time, OnStar proposed a compromise to Plaintiff: in addition to the Reading Room, OnStar would make available three hard copies of the complete, unredacted documents, for review and analysis at a Kirkland & Ellis office location most convenient to Plaintiff's expert(s) (Kirkland & Ellis has domestic offices in New York, Washington, D.C., Chicago, Los Angeles, and San Francisco), with no limits on the times Plaintiff may spend in doing so; or, alternatively, OnStar also offered to Plaintiff to pay for someone, approved by General Motors, to make the necessary redactions. At the same time, Plaintiff was reminded that the Reading Room was also available to review the documents. (Ex. 9, 3/21/2008 Ltr. N. Siegel to K. Szpondowski.)

On March 31, 2008, Ms. Szpondowski sent an email to one member of counsel for OnStar requesting availability for a meet and confer. (Ex. 10, 3/31/2008 email K. Szpondowski to E. Siegel.) Less than twenty-four hours later, while counsel for OnStar and GM was deposing inventor Irene Hu in Palo Alto, California, Ms. Szpondowski filed the instant motion. At no time did Ms. Szpondowski call counsel for OnStar and GM, or meet and confer with counsel for

---

3 "Indeed, Plaintiff does not dispute that completely unrelated information to this lawsuit (i.e. the internal GM/OnStar 'codes' in the source code) may be redacted." (Pl.'s Br. at 9.)

OnStar and GM, regarding her current redaction concerns or OnStar and GM's outstanding compromise.

## ARGUMENT

### II. Plaintiff's Motion is Premature Because Plaintiff Has Failed to Fulfill its Meet and Confer Obligation Prior to Filing this Motion.

Local Rule 37.2 requires that the parties meet and confer prior to filing a discovery motion with the Court, but Plaintiff has failed to do so. To date, the parties have been successful in resolving disputes without court intervention, filing numerous agreed motions and stipulations with this Court, and there is no reason for this dispute to be in front of the Court at this time. If Plaintiff's counsel complains that she did not receive a response to its email, which was sent to a single attorney, she could have picked up the phone and called counsel for OnStar, rather than filing this motion less than 24 hours after sending the email.

Moreover, it is not entirely clear what Plaintiff seeks because its position keeps changing, as does its complaints. ***First***, Plaintiff complained that it could not print documents. Even though this allegation was untrue, OnStar commissioned new software to make printing even easier than it had been during Plaintiff's initial visit to the Reading Room. ***Second***, Plaintiff complained that the issue was whether Plaintiff could "print out full documents." (Pl.'s Br. at 11.) Plaintiff always could print out full documents. This is not the issue. The issue is that Plaintiff has refused to follow the Joint Stipulation, which requires that only relevant information be printed (whether full or partial documents). OnStar has not changed its position on this point. (Ex. 7, 2/29/08 email E. Siegel to K. Szpondowski; Ex. 9, 3/21/2008 Ltr. E. Siegel to K. Szpondowski.) ***Third***, Plaintiff admits that "Plaintiff does not dispute that completely unrelated information to this lawsuit (i.e. the internal GM/OnStar "codes" in the source code) may be redacted," (Pl.'s Br. at 9), and then disputes that redactions are necessary.

## III. OnStar Has Not Refused Plaintiff Access to Relevant Information.

Plaintiff cannot reasonably argue that OnStar has denied it access to relevant information. Indeed, rather than preventing Plaintiff from accessing Source Code, OnStar arranged a full text "Google" search to assist Plaintiff's counsel and experts in reviewing and analyzing the information. But Plaintiff's counsel has failed to hold up its end of the bargain: sending an unprepared attorney to the Reading Room — an attorney who has no involvement in this case — and then by visiting the Reading Room with a paralegal rather than an expert consultant, and in both cases, seeking to circumvent the Joint Stipulation's limitation on printing relevant ***excerpts*** of documents. Plaintiff's position has shifted again and again — as soon as OnStar's counsel believes the parties have reached agreement on how information is to be protected and disclosed, Plaintiff's counsel finds another reason to complain.

The issue is not whether these documents contain relevant information, but rather whether the additional AIF codes, ***which Plaintiff admits are not relevant*** or necessary to Plaintiff's understanding of the accused features, may be redacted from documents produced in this case.

## IV. The Information At Issue Warrants Protection and OnStar Has Proposed Reasonable Measures that Balance Plaintiff's Requests with the Need for Security and OnStar's Right Not to be Unduly Burdened.

OnStar's concern is not that Plaintiff's counsel would see this information — as Plaintiff's counsel already has, in the Reading Room — but rather the risk of inadvertent disclosure. *See, e.g., Autotech Techs. Ltd. Partnership v. Automationdirect.com, Inc.*, 237 F.R.D. 405, 408 (N.D. Ill. 2006) ("the court does not in any way doubt the faithfulness of…counsel in endeavoring to abide by the terms of any protective order. The issue concerns not good faith but risk of inadvertent disclosure.'") (quoting *FTC v. Exxon Corp.*, 636 F.2d 1336, 1350 (D.C. Cir. 1980)). OnStar does not doubt that counsel for Plaintiff seeks to use these documents in good

faith, but the Agreed Protective Order cannot prevent inadvertent and unforeseen disclosure by third party contractors working with Plaintiff's counsel, for example. Once disclosure occurs, no protective order can undue the harm to OnStar's subscribers.[4] Without redaction, inadvertent disclosure would expose OnStar's subscribers to severe and unacceptable security risks. Plaintiff, on the other hand, merely needs to understand how the accused features function, ***not*** which specific codes are used. Accordingly, the safety and security of OnStar subscribers trumps Plaintiff's desire to have complete, unredacted documents.

### A. Redactions are proper to prevent inadvertent disclosure of sensitive information.

Redactions are not rendered improper simply because they are not based on privilege, as Plaintiff argues. (Pl.'s Br. at 2). Courts routinely allow, and even order, the redaction of sensitive, or merely irrelevant, information. *See, e.g., Bond v. Utreras*, 2006 WL 695447, at *4 (N.D. Ill., Mar. 10, 2006) (directing redaction of personal information contained in personnel files prior to production); *Abrams v. Resolution Trust Corp.*, 1994 WL 710766, at *3 (N.D. Ill., Dec. 17, 1994) (ordering billing statements "redacted to eliminate irrelevant material"); *In re FedEx Ground Package System, Inc.*, 2007 WL 79312, at *6 (N.D. Ind., Jan. 5, 2007) (ordering procedure for redacting information that is not relevant, protected by privacy interests, or privileged). The need to protect the security of OnStar's subscribers is ***at least*** as important as the need to protect privacy or financial interests discussed in *Bond, Abrams, and In re FedEx.*

Plaintiff has offered no explanation for why OnStar's proposed method of production would prevent Plaintiff from preparing its case. Plaintiff has access to the complete information

---

4 The eSpeed case cited on page 12 of Plaintiff's brief is inapposite. *Trading Technologies v. eSpeed* involved patented options trading software, not personal sensitive information, and certainly not information relating to the safety and security of millions of OnStar subscribers. *Trading Techs. Int'l. v. eSpeed, Inc.*, 2005 U.S. Dist. LEXIS 10686, *11 (N.D. Ill. 2005).

and can print relevant excerpts for use at deposition and trial.

**B. Redacting each and every one of the 700 documents requested by Plaintiff would result in undue burden to OnStar.**

Plaintiff admittedly designated 700 whole documents, representing over 17,000 pages, for production, each of which requires substantial redaction of codes spread throughout the document. Plaintiff argues that "Plaintiff's representatives selected the documents it felt were relevant to this lawsuit — that is all." (Pl.'s Br. at 11.) Respectfully, though, Plaintiff's counsel attended the Reading Room not with an expert consultant, but a paralegal. Rather than taking the time to review and analyze the results of their searches, Plaintiff's counsel and her paralegal printed 700 documents *en masse*, even though Plaintiff admits that "[g]iven the technicality of patent infringement cases, these are not documents that can simply be glanced at. They must be studied." (Pl.'s Br. at 12.)[5] Now Plaintiff cries foul when OnStar asks for the reasonable accommodation of additional time or resources to redact sensitive information to make these documents available for Plaintiff.

**V. OnStar and GM Have Proposed a Compromise to Which Plaintiff Has Not Yet Responded.**

OnStar told Plaintiff that it would make the necessary redactions to the 700 documents selected by Plaintiff's non-technical representatives, provided that Plaintiff 1) allowed sufficient time for OnStar to do so; or 2) paid to have additional resources staffed to make the redactions. Rather than discussing OnStar's proposed compromise with counsel for OnStar, Plaintiff filed the instant motion and now offers a parade of horribles as to how this compromise would burden the Plaintiff. As repeatedly stated, OnStar is willing to redact without charge a reasonable

5 In fact, on March 25, 2008, Ms. Szpondowski complained that she could not locate an "AACN System Requirements Document" and alleged that the Reading Room was not complete when, in fact, Ms. Szpondowski designated such a document ***twice.*** (Ex. 11, 3/25/08 Ltr. K. Szpondowski to E. Siegel) In addition, Ms. Szpondowski designated multiple sub-system specifications that relate solely to a feature ***not accused in this case.***

number of excerpts properly selected by Plaintiff's expert in accordance with the Court's order.[6]

In addition, and at its own expense, OnStar has provided accommodations that more than address any legitimate concern of Plaintiff. For example, OnStar offered to produce additional copies at the offices of Kirkland & Ellis LLP (just a few blocks from Plaintiff's counsel) (the second reading room accommodating Plaintiff in this case). This completely addresses plaintiff's legitimate concerns. The requested documents have been ***continuously*** available in their entirety for months and are now ***immediately available*** to Plaintiff without the need to travel to the Reading Room. Documents can also be delivered to Plaintiff after redactions are complete. Rather than wasting the parties' and this Court's time and efforts filing premature motions without fully meeting and conferring, Plaintiff and its experts would be better served by reviewing the documents, which have always been available, just not in the exact manner unreasonably demanded by Plaintiffs.

## CONCLUSION

For the foregoing reasons, OnStar requests that the Court deny Plaintiff's premature Motion to Compel.

---

6 It is unreasonable for Plaintiff to suggest that they will use 700 documents containing 17000 pages of material in an eight hour deposition. (*See* Pl.'s Br. at 10.)

April 4, 2008

Respectfully submitted,

/s/ Lydia E.Wahlke
John T. Hickey, Jr., P.C.
Craig D. Leavell
Tiffany P. Cunningham
Edward M. Siegel
Lydia E. Wahlke
KIRKLAND & ELLIS LLP
200 E. Randolph Drive
Chicago, Illinois 60601
jhickey@kirkland.com
cleavell@kirkland.com
tcunningham@kirkland.com
nsiegel@kirkland.com
lwahlke@kirkland.com

*Counsel for Defendants General Motors Corporation, OnStar Corporation, and Toyota Motor Sales USA, Inc.*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on April 4, 2008, I caused the foregoing ONSTAR AND GM'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL to be served on counsel of record via the Electronic Court Filing ("ECF") system, in compliance with the Federal Rules of Civil Procedure and the Local Rules of this Court:

Paul K. Vickrey
Richard B. Megley, Jr.
Kara L. Szpondowski
NIRO, SCAVONE, HALLER & NIRO, LTD.
181 West Madison Street, Suite 4600
Chicago, Illinois 60602-4515
Fax 312.236.3137
pvickrey@nshn.com
szpondowski@nshn.com

David M. Schnorrenberg
Mark M. Supko
Mark H. Neblett
Eva U. Gunasekera
Jeffrey D. Sanok
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Fax 02.628.5116
dschnorrenberg@crowell.com
msupko@crowell.com
mneblett@crowell.com
egunasekera@crowell.com
jsanok@crowell.com

John Flock
Thomas R. Makin
Kevin J. Prey
KENYON & KENYON LLP
One Broadway
New York, NY 10004-1007
jflock@kenyon.com
tmakin@kenyon.com
kprey@kenyon.com

Robin Korman Powers
Kenneth P. Taube
ROTHSCHILD, BARRY & MYERS, P.C.
55 West Monroe Street
Xerox Centre, Suite 3900
Chicago, IL 60603
Fax 312.372.2350
powers@rbmchicago.com
taubek@rbmchicago.com

/s/ Lydia E. Wahlke
*Counsel for Defendants General Motors Corporation, OnStar Corporation, and Toyota Motor Sales USA, Inc.*