IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FERNANDEZ INNOVATIVE TECHNOLOGIES, L.L.C., | ) ) ) | Case No. 07 C 1397 |
| Plaintiff, | ) ) | |
| v. | ) ) | Judge Virginia M. Kendall |
| GENERAL MOTORS CORPORATION; ONSTAR CORPORATION; and TOYOTA MOTOR SALES, U.S.A., INC., | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Fernandez Innovative Technologies, L.L.C. ("Fernandez") has sued General Motors Corporation ("GM"), Onstar Corporation ("Onstar"), and Toyota Motor Sales, U.S.A., Inc. ("Toyota") (collectively "Defendants")[1] for infringement of United States Patent No. 6,963,899 (the "'899 patent"), entitled "Adaptive Direct Transaction for Network Client Group." On February 27, 2008, the Court held a claims construction hearing (the "claims construction hearing" or the "hearing"), at which time it heard evidence and argument regarding the construction of various claim terms in the '899 patent. The Court's construction of these terms is set forth below.

## BACKGROUND

Fernandez accuses Defendants of infringing several claims of the '899 patent. (Compl. ¶¶ 10-21.) According to the '899 patent, the invention at issue resides in software that allows for

---

[1] On February 15, 2008, the Court dismissed defendant @Road, Inc. from the current action pursuant to the parties' agreed motion to dismiss. Subsequently, on May 1, 2008, the Court also dismissed defendants Mercedes-Benz U.S.A. and BMW of North America L.L.C. from the suit pursuant to the parties' respective stipulations of dismissal.

directing on-line messages adaptively to a classified client set according to monitored set characteristics. (JA, Ex. A, '829 Patent col.1 ll.35-33.) The accused technology includes the following products: (1) with respect to GM and OnStar, the OnStar system; and (2) with respect to Toyota, the Lexus Link system. (Compl. ¶¶ 11-12, 14.) According to Defendants, the accused technology relates to "vehicle telematics," or, more specifically, "the field of technology generally encompass[ing] systems that involve the collection, transmission and use of information gathered from a vehicle to, for example, provide driver assistance in the event of a crash, track fleet vehicle locations, or provide remote maintenance diagnostics." (Def. Claim. Constr. Br. 2.)

## STANDARD OF REVIEW

Claim construction resolves disputed meanings in a patent to clarify and explain what the claims cover. *Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1382 (Fed. Cir. 2005). The construction of the claims at issue is a legal determination to be made by the court. *Id.* (*citing Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995)). Generally, the terms of a claim are given the ordinary and customary meaning that the terms would have to a person of ordinary skill in the art at the time of the filing date of the patent application. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). When interpreting an asserted claim, the court looks first to intrinsic evidence: the words of the claims, the patent specification, and the prosecution history. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

The claim language is the starting point for claim construction analysis because it frames and ultimately resolves all issues of claim interpretation. *Robotic Vision Sys., Inc. v. View Eng'g Inc.*, 189 F.3d 1370, 1375 (Fed. Cir. 1997). In some cases, the "ordinary and customary" meaning of the claim language may be readily apparent, even to lay judges, and the court applies the widely

accepted meaning of the commonly understood words. *Phillips*, 415 F.3d at 1314. In such cases, a general purpose dictionary may be helpful. *Id.* In many cases, however, the court must proceed beyond the bare language of the claims and examine the patent specification. *Id.* at 1314-15. "The person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. The specification is usually dispositive; "it is the single best guide to the meaning of a disputed term." *Id.* at 1315 (*quoting Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). In the specification, the patentee provides a written description of the invention that allows a person of ordinary skill in the art to make and use the invention. *See id.* at 1323. At times, the patentee uses the specification to "set forth an explicit definition for a claim term that could differ in scope from that which would be afforded by its ordinary meaning." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001).

The court may also look to the patent's prosecution history. *Phillips*, 415 F.3d at 1317. While the prosecution history often lacks the clarity of and is less useful than the specification, it may inform the court of the meaning of a claim term by illustrating how the inventor understood the invention as well as how the inventor may have limited the scope of the invention. *Id.* The prosecution history is generally relevant if a particular interpretation of the claim was considered and specifically disclaimed during the prosecution of the patent. *Schumer v. Lab. Comp.* Sys., 308 F.3d 1304, 1313 (Fed. Cir. 2002).

Finally, a court may also consult "extrinsic evidence," such as dictionaries, treatises, and expert testimony, to "shed useful light on the relevant art." *Phillips*, 415 F.3d at 1317-18. Generally, extrinsic evidence is "less reliable" than intrinsic evidence and is "unlikely to result in

3

a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19. With respect to the use of dictionaries, technical or general, a court may consult such evidence "so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Id.* at 1322-23.

## DISCUSSION

I.    Agreed-Upon Terms

The parties agree upon the constructions of several terms found in the disputed claims in the '899 patent. The Court adopts the agreed-upon constructions, as set forth in the Parties' Final Joint Claim Construction Chart. At the claim construction hearing, the parties indicated that they also agree upon the construction of the following terms: (1) "network"; (2) "server"; (3) "on-line"; and (4) "electronic digital feedback or control signal." In addition, the parties came to a partial agreement with respect to the phrase: "directing one or more messages in response to the set classification, wherein the directed one or more messages is provided by the server to the one or more clients classified in the first client set." The parties agree as to the meaning of "directing one or more messages in response to the set classification, wherein the directed one or more messages is provided by the server," but dispute the construction of "to the one or more clients classified in the first client set." The Court also adopts the constructions agreed upon at the hearing.

II.    Disputed Terms

The parties dispute the meaning of the following ten terms and phrases used in the '899 patent: (1) "client"; (2) "client attribute"; (3) "client sensor"; (4) "associated client"; (5) "real-time"; (6) "real-time configuration"; (7) "messages"; (8) "the one or more clients classified in the first client set"; (9) "the one or more clients"; and (10) "the interface receiving first network signal

4

according to the classified set." The former nine terms initially appear in claim 1 of the '899 patent. The final term - "the interface receiving first network signal according to the classified set" - is found in claim 7.

A.      "*Client*"

The term "client" initially appears in the preamble to claim 1. Fernandez contends that the term "client" refers to "an agent that requests services of a server." Prior to the claim construction hearing, Defendants argued that the term meant "a computer that accesses a shared resource on a server over a telecommunications network." At the claim construction hearing, Defendants submitted the following alternative construction: "processing machine or processing device that accesses a shared resource on a server over a communications network." For the reasons set forth below, the Court adopts Defendants' revised construction of the term "client."

The parties' proposed constructions mirror dictionary definitions for the term "client." Fernandez's proposed construction relies upon *The Authoritative Dictionary of IEEE Standard Terms*, which also defines "client" as "[a]n agent that requests services of a server." (Pl. Claim Constr. Mem., Ex. 2, *The Authoritative Dictionary of IEEE Standard Terms* at 176.) Defendants' original and revised constructions are consistent with the *Microsoft Press Computer Dictionary*, which defines "client" as follows: "[o]n a local area network or the Internet, a computer that accesses shared network resources provided by another computer (called a server)." (Defs. Claim Constr. Mem., Ex. 3, *Microsoft Press Computer Dictionary* at 92.) While a court may rely on a dictionary to construe claim terms, it may only do so when it considers the definition in the context of intrinsic evidence and only then to the extent that the "definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Phillips,* 415 F.3d at

1318-19, 1322-23.  "Heavy reliance of the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification."  *Id.* at 1321.  Considering the proposed definitions in the context of the intrinsic evidence presented, the Court concludes that Defendants' proposed revised construction comports with the specification and language of the claim.  In contrast, Fernandez's proposed construction strays too far from the scope of the invention.

According to the '899 patent, the invention at issue "relates to *networked computer applications*, particularly to distributed client-server software" and "resides in *software* for directing on-line messages." (JA, Ex. A, '829 Patent col.1 ll.13-14, ll.33-34.)  In addition to these statements regarding the invention as a whole, the specification also explains that: (1) "it is contemplated that the *server or client processing functionality may be embodied in* one or more *processing machines or devices,*"  (JA, Ex. A, '829 Patent col.2 ll.16-18) (emphasis added); (2) "user client database 104 may be updated to indicate *network connectivity and configuration between any servers and/or clients coupled thereto,*" (JA, Ex. A, '829 Patent col.4 ll.57-62) (emphasis added); and (3) "*network 4, including server(s) 2 and client(s). . . employ software and/or functionally equivalent firmware, hardware, or electronics,*" (JA, Ex. A, '829 Patent col.2 ll.27-32).  Fernandez's proposed construction conflicts with these explanations and risks expanding the scope of the invention beyond the boundaries articulated in the '899 patent.  Specifically, Fernandez's use of the words "an agent" to describe the "client" suggests that a vehicle, a patient, an office, or a school could be a client.  Such a broad characterization of term "client" is not supported by the patent, which emphasizes the need for processing machines and devices as well as coupling between the server and the client.

6

Fernandez's construction is also inconsistent with the language of claim 1. Claim 1 requires the sensor interface to electronically access "one or more client sensor coupled locally to an associated client." (JA, Ex. A, '829 Patent col.10 ll.11-13.) Claim 1 further requires the "particular client sensor" to be "physically embedded in or electronically integrated with its associated client" and that the client sensor "automatically generate[s] an electronic digital feedback or control signal for real-time monitoring or configuration." (JA, Ex. A, '829 Patent col.10 ll.11-18.) As discussed below, the Court construes the term "associated client" to mean "the single client to which a particular client sensor is locally coupled." In other words, the "client" and "associated client" are one and the same. Thus, claim 1 requires that the client sensor be coupled locally to the client and either "physically embedded in or electronically integrated with [the client]" in such a way that allows the client sensor to "generate electronic feedback or control." As noted above, Fernandez suggests that a person could be a "client." This proposed construction conflicts with the claim's requirements that the client sensor be coupled locally to the sensor and either "physically embedded in or electronically integrated with [the client]" in such a way that allows the client sensor to "generate electronic feedback or control." Thus, Fernandez's characterization of "client" not only overstates the scope of the invention discussed in the '899 patent, but also conflicts with the surrounding language of claim 1.

Because Defendants' proposed construction "'stays true to the claim language and most naturally aligns with the patent's description of the invention,'" *Phillips*, 415 F.3d at 1316 (*quoting Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)), the Court determines that the term "client" means "a processing machine or processing device that accesses a shared resource on a server over a communications network."

7

B.      "*Client attribute*"

The term "client attribute" initially appears in the following language of claim 1: "determine for each client one or more *client attributes* according to data received from one or more sensor interfaces, wherein the one or more *clients attributes* determination is provided by a server." (JA, Ex. A, '829 Patent col.10 ll.8-11) (emphasis added.) Fernandez asserts that the term refers to "monitored signals, data, or values of the client or an objective condition of the client capable of being physically detected by a sensor." Defendants propose that the term means "an objective condition of the client capable of being physically detected by a sensor." Thus, the parties disagreement revolves around whether the term "client attribute" encompasses "monitored signals, data, or values of the client."

The parties' proposed constructions are based on the following statement in the specification: "Generally, subject attribute or generated signal may represent one or more monitored signals, data, or values, such as client location, elapsed or actual time, client or user entry selection, physical, mechanical, medical or other objective condition." (JA, Ex. A, '829 Patent col.3 ll.21-25.)  As Defendants note, Fernandez's proposed construction "conflates what constitutes a client attribute . . . with how the attribute is represented;" the "signals, data, an values" are not client attributes, but rather, representatives of the objective conditions physically detected by the sensors. (Def. Claim Constr. Mem. 9-10.) In contrast, Defendants' proposed construction is supported by the language of the claim as well as the specification. The method set forth in claim 1 requires a determination of "one or more *client attributes according to data received* from one or more sensor interfaces." (JA, Ex. A, '829 Patent col.10 ll.9-11) (emphasis added.)  In addition, claim 1 specifies that the client sensor *physically detects* the client attributes. (JA, Ex. A, '829 Patent col.10 ll.19-20.) This

8

language clarifies not only that a client attribute must be an objective condition, but also that "signals, data, an values" are representative of the client attribute physically detected by the sensors and do not constitute the client attribute.

The specification provides further support for the conclusion. In addition to the statement noted above, the specification's several references to and examples of a "client attribute" make clear that "client attributes" means "objective conditions of the client capable of being physically detected by a sensor." For instance, the specification explains that: (1) the "client sensor interface may provide various monitored still images, live video, audio, states, data or attribute signals representative theorof, such as mobile location, medical condition, or other detectable attribute," (JA, Ex. A, '829 Patent col.2 ll.55-59); (2) "[u]ser client or sensor site module 104 includes . . . monitored or sensed client attributes (e.g., time, location, temperature, available resources, etc.)," (JA, Ex. A, '829 Patent col.3 ll.60-65); (3) "to monitor, diagnose and/or control data signals, alarm or out-of-specified range condition, pre-specified states, or other objectively detectable or attributes," (JA, Ex. A, '829 Patent col.5 ll.36-39, col.6 ll.9-12, ll.39-41); and (4) "[c]lient sensor interface provides mobile location, medical condition, or other attribute," (JA, Ex. A, '829 Patent col.1 ll.39-40). While the Court is careful not to read limitations from the specification into the claim, the language of the claim as well as the specification demonstrate that the term "client attribute" is limited to objective conditions. Thus, the Court adopts Defendants' construction of the term "client attribute."

C.     *"Client sensor"*

Both parties agree that the dispute regarding the meaning of the term "client sensor" rests upon the parties' disagreement regarding the construction of the term "client attribute." (Pl. Claim

Constr. Mem 17; Defs. Claim Constr. Mem. 11; Claim Constr. Hr'g Tr. 11:13:32-11:13:42, Feb. 27, 2008.) Fernandez contends that "client sensor" means "a device used to physically detect information about the client." Defendants argue that Fernandez's construction is overly broad and proposes that "client sensor" means "a device use to physically detect an objective condition of the client." Consistent with the Court's previous construction of the term "client attribute" and for the reasons set forth in subsection II(B), the Court adopts Defendants' construction of the term "client sensor."

D.      "*Associated client*"

The parties dispute the meaning of the term "associated client" in the phrase "at least one sensor interface electronically accessing one or more client sensor coupled locally to an associated client for real-time monitoring or configuration thereof." According to Defendants, "the term 'associated client' merely clarifies that the client is "associated with the sensor to which it is coupled"; there is an "association" between the client and the sensor. (Def. Claim Contr. Mem. 15.) Defendants contend that the term should be construed as "the single client to which a particular client sensor is locally coupled." Fernandez argues, however, that the "associated client" is not the client itself, but rather, "part of the system that monitors the client's attributes." (Pl. Reply 8.) Thus, Fernandez proposes that the term refers to "the client's microprocessor or embedded controller."

The Court adopts Defendants' proposed construction of the term "associated client," as it comports with the claim language, specification, and prosecution history. First, claim 1 sets forth a method that occurs in a "network comprising a server coupled to one or more clients" and articulates steps that occur with regard to "each client" included within the "one or more clients" grouping. For instance, claim 1 provides steps for "determining *for each client* one or more client

10

attributes," "classifying *each client* into a first client set," and "directing . . . messages. . . to the *one or more clients* classified in a set."  (JA, Ex. A, '829 Patent col.10 ll.5-8, 23, 25-28) (emphasis added.)  Thus, the claim language emphasizes that each step occurs with regard to the single client included in "the one or more clients" group.  Claim 1 further states that the client sensor is "physically embedded in or electronically integrated *with its associated client*."  (JA, Ex. A, '829 Patent col.10 ll.26-27.)  Consistent with the claim language, Defendants' proposed construction clarifies that a particular client sensor is not only "coupled locally to," but also "physically embedded in or electronically integrated with" this same client for which the client attributes are determined and to which the server sends messages.  Additionally, while the term "associated client" does not appear in the patent's specifications, the following description of Figure 4, a block diagram of the client interface, also supports Defendants' proposed construction of the claim language: "Moreover, during or after initial set-up, user client database 104 may be updated to indicate network connectivity and configuration between any servers and/or clients coupled thereto, as well as connectivity and configuration of any *sensor or equivalent devices associated with one or more such clients*."  (JA, Ex. A, '829 Patent col.4 ll.57-62) (emphasis added.)

Finally, Defendants' proposed construction is also supported by the prosecution history.  As noted above, prosecution history may inform the court of the meaning of a claim term by illustrating how the inventor understood the invention or limited the scope of the invention.  *Phillips*, 415 F.3d at 1317.  In this case, the prosecution history reveals that the inventor used the term "associated client" to clarify that each sensor is coupled locally to its client.  Throughout the prosecution of the patent, the examiner questioned the application as to the scope of claim 1 and forced the applicant to narrow the claim's scope as a result of prior art.  In October 2003, the inventor amended the claim

to specify that a sensor is "coupled to associated client." (JA, Ex. B, Patent Prosecution History FH 227.) According to the inventor, this distinguished the invention from prior art because prior art used sensors located in the system's server, as opposed to the invention at issue, which utilized a "sensor coupled to associated client, such that the coupled sensor physically detects client attribute." (*Id.*) The examiner rejected the patent application and the inventor further amended the claim "to clarify that each sensor is coupled 'locally' to *its* associated client for local detection of that particular client [sic] attributes." (JA, Ex. B, Patent Prosecution History FH 198) (emphasis added). The inventor further emphasized the novelty of "such *local client-sensor* coupling." (*Id.*) These amendments and explanations demonstrate that both the patent office and the inventor limited the scope of invention during the course of prosecution and used the phrase "associated client" to clarify that each sensor is coupled locally to its client.

Thus, in light of the language of the claim, the specification, and the prosecution history, the Court construes the phrase "associated client" to mean "the single client to which a particular client sensor is locally coupled."

E.      "*Real-time*"

Throughout the parties' claim constructions submissions and at the claim construction hearing, the parties agreed that the term "real-time" meant "continuous." Shortly after the hearing, Fernandez filed a Motion to Address the Construction of the Term "Real-Time," in which Fernandez admitted that it had mistakenly agreed to the Defendants' proposed construction and requested the Court to consider its arguments in support of an alternative construction for the term. (Pl. Mot. Address "Real-Time.") The Court took the motion under advisement and granted Defendants' leave to file a position paper regarding the construction of the term "real-time," which Defendants' filed

12

on March 10, 2008. (*See* Dk. # 129; Def. Resp. Mot. Address "Real-Time.") In their response, Defendants urged the Court not to consider Fernandez's motion in light the parties' previously agreed upon construction. As noted above, claim construction is an issue of law for the Court to decide. *Terlep*, 418 F.3d at 1382. Although tardy in filing its objection to Defendants' proposed construction, Fernandez's motion (and Defendants' response) illustrates that the meaning of the "real-time" remains in dispute. In light of the parties disagreement, the Court concludes that it must construe the term "real-time."

The term "real-time" initially appears in the following language of claim 1: "one or more client attributes determination is provided by a server, at least one sensor interface electronically accessing one or more client sensor coupled locally to an associated client for real-time monitoring or configuration thereof." (JA, Ex. A, '829 Patent col.10 ll.13-15.) Fernandez argues that the term "real-time'" means "on a contemporaneous or 'as it happens' basis." Defendants maintain that "real-time" means "on a continuous basis." Alternatively, Defendants offer a proposed compromise construction of "real-time" in the context of "real-time monitoring" and "real-time configuration."[2] With respect to the phrase "real-time monitoring," Defendants propose the following compromise construction: "of or pertaining to a mode of computer operation in which the computer is checking, detecting, observing, tracking or logging client attribute information as it is being physically detected." With respect to the phrase "real-time configuration," Defendants propose the following compromise construction: "of or pertaining to a mode of computer operation in which the computer is controlling the functional arrangement of the sensor as it is physically detecting client attribute

---

[2] The parties agree that the term "real-time" applies to both "monitoring" and "configuration." (*See* Claim Constr. Hr'g Tr. 12:02:04 - 12:02:12, Feb. 27, 2008.)

information." For the reasons stated below, the Court adopts Fernandez's construction of the term "real-time."

Relying on *Webster's New World Dictionary*, *Third College Edition* (*Webster's Third*), Fernandez argues that the term "real-time" should have its plain and ordinary meaning. *Webster's Third* defines "real-time" as "of or pertaining to a mode of computer operation in which the computer collects data, computes with it, and uses the results to control a process as it happens." (Pl. Mot. Address "Real-Time," Ex. B, Webster's New World Dictionary at 4.) As noted above, a court may consult a dictionary if it is considered in the context of intrinsic evidence and "the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Phillips*, 415 F.3d at 1318-19, 1322-23.

Fernandez's proposed construction is not divorced from the intrinsic evidence presented, as Defendants suggest. To the contrary, the proposed construction of "real-time" as "contemporaneous or 'as it happens'" is consistent with the patent specification and accurately represents the ordinary and customary meaning of the term. For instance, the specification explains that the client sensors "may be implemented in . . .  airborne and/or marine transport systems or subsystems, such as mechanical (e.g., . . . mechanical linkage stress or strain . . . related drive train monitor, vehicle braking or brake anti-locking, . . . emergency condition, seatbelt securement or airbag deployment, or impact detection, diagnosis, and/or control thereof)." (JA, Ex. A, '829 Patent col.5 ll.61- col.6 l.2.) The specification also states that the microprocessors or embedded controllers are used to "monitor, diagnose and/or control data signals, alarm or out-of-specified range condition, pre-specified states, or other objectively detectable or attributes." (JA, Ex. A, '829 Patent col.5 ll.34-39.) Such statements support Fernandez's argument that the monitoring and configuration discussed

14

in claim 1 occurs on a "contemporaneous or 'as it happens,'" basis, rather than a "continuous" basis. Further, the Court notes that Fernandez's insertion of the word "contemporaneous" is not inconsistent with the intrinsic and extrinsic evidence presented, nor does it render the proposed construction redundant, as Defendants suggest. Instead, Fernandez's proposed construction most accurately represents the ordinary and customary meaning of the term "real-time" in the context of the '899 patent.

Thus, having considered the parties' arguments, proposed constructions, and the evidence provided, the Court determines the phrase "real-time" means "contemporaneous or 'as it happens.'"

F.      *"Real-time configuration"*

As noted above, claim 1 of the '899 patent refers to "real-time configuration." Fernandez argues that the term "configuration" in the phrase "real-time configuration" should be given its ordinary meaning of "functionality."[3] Defendants contend that the term is indefinite because the '899 patent fails to provide guidance as to the meaning of the term. In the alternative, Defendants suggest that the term "configuration" means "the functional arrangement."[4] For the reasons set forth below, the Court concludes that "configuration" in the phrase "real-time configuration" means "the functionality."

A patent claim is sufficiently definite if "one skilled in the art would understand the bounds of the claim when read in light of the specification." *Exxon Research & Eng'g Co. v. United States*,

---

[3] Fernandez initially argued that the term "configuration" in the phrase "real-time configuration" should be construed as "the functional arrangement." At the claim construction hearing, however, Fernandez amended its proposed construction to "the functionality." (Claim Constr. Hr'g Tr. 11:54:28 - 11:54:36, Feb. 27, 2008.)

[4] Defendants proposed the alternative construction during the claim construction hearing and in its Response to Fernandez's Motion to Address the Construction of the Term "Real-Time." (*See* Claim Constr. Hr'g Tr. 11:56:30 - 11:57:22, Feb. 27, 2008; Def. Resp. Mot. Address "Real-Time" at 5.)

265 F.3d 1371, 1375 (Fed. Cir. 2001). "Claims are not indefinite merely because they present a difficult task of claim construction." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008). Only claims that are "'insolubly ambiguous'" or "'not amenable to construction'" are indefinite. *Id.* at 1250 (*quoting Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005)). Proof of such indefiniteness requires "an exacting standard" that is met where the challenger "shows by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area." *Halliburton*, 514 F.3d at 1249-50. "If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, . . . the claim [is] sufficiently clear to avoid invalidity on indefiniteness grounds." *Exxon Research & Eng'g Co.*, 265 F.3d at 1375. Defendants have failed to meet this "exacting" standard of indefiniteness. As such, the Court concludes that the term at issue is sufficiently definite and, for the reasons stated below, adopts Fernandez's proposed construction.

Although the '899 patent does not explicitly define the term "configuration," the ordinary meaning of the term is readily apparent. Thus, the term is not unduly ambiguous when taken in the context of the patent specification. When "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent. . . claim construction . . . involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. As noted by Fernandez, a sensor generally reacts to a measured property or condition and must be functionally "set" to know when to "react" to said property or condition. This, in other words, is the sensor's configuration. Fernandez's proposed construction, which is based on

16

*Webster's Ninth New Collegiate Dictionary*, is consistent with this understanding, as well as the patent and the scope of the invention. (*See, e.g.*, (JA, Ex. A, '829 Patent col.4 ll.62-65) ("user client database 104 may indicate one or more user-preferred network configuration, transaction selection, or sensor-related attribute); (JA, Ex. A, Patent No. '829 Patent col.5 l.26-col.5 l.33) ("Sensor input signals from one or more client sites may be received continuously, scheduled at regular intervals, triggered by specified alarms and conditions, selectably activated by client or server, or adaptively or proportionately increased or decreased in sensing activity according to pre-specified or associated attributes, current related activity, or specified or monitored client group or set conditions or monitored activity.")) Thus, having considered the parties' arguments and evidence with respect to the construction of the term "real-time," the Court determines that the term "configuration" means "the functionality."

G.      *"Messages"*

Fernandez argues that the term "messages" refers to "communications whose content is commercial, promotional or marketing symbol, audio, text, still image, video, or other media content or signal." Defendants contend that the term should be construed as "communications whose content is commercial, promotional or marketing in nature, in the form of symbol, audio, text, still image, video, or other media content or signal." The parties dispute, which revolves around Defendants' insertion of the phrase "in nature, in the form of," amounts to a disagreement as to the scope of the claimed messages. Fernandez's proposed construction strays too far from the definition set forth in the patent documents. Thus, for the reasons stated below, the Court adopts Defendants' proposed construction of the term "messages."

Both parties rely on the following definition of messages, as set forth in the specification: "subject server 2 . . . generates and/or sources one or more directed or targeted message, which may include commercial, promotional, or marketing symbol, audio, text, still image, video, or other media content or signal." (JA, Ex. A, '829 Patent col.9 ll.19-23.) Consistent with this definition, Defendants' proposed construction merely clarifies for the jury that the content of the communications is commercial, promotional, or marketing in nature and that such communications are in the form of symbol, audio, text, still image, video, or other media content or signal.

This construction is also supported by other statement in the specification, which demonstrate that the claimed "messages" are limited to communications that are commercial, promotional, or marketing in nature. "Statements that describe the invention as a whole, rather than statements that describe only preferred embodiments, are more likely to support a limiting definition of a claim term" *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004). In this case, the patent includes multiple statements that limit the scope of the invention to communications that are commercial, promotional, or marketing in nature. For instance, the Abstract of the '899 patent explains the invention as follows: "Internet-based software and associated database provide group analysis overlay to monitor client-server web traffic and *provide direct marketing* to client group." (JA, Ex. A, '829 Patent, Abstract.) Similarly, the "Background of Invention" section emphasizes that "prior-art approaches at facilitating on-line commerce are limited, particularly with respect to enabling *direct marketing*, especially for multiple targets or client groups." ((JA, Ex. A, '829 Patent col.1 ll.27-29); *see also* (JA, Ex. A, '829 Patent col.10 l.6) (claim 1 sets forth "a method for *directed on-line commerce.*"); (JA, Ex. A, '829 Patent col.7 l.63- col.8 l.2) ("[T]he Internet-based client interface 10, 20, 30 and associated database 100 effectively provide group analysis processing

18

to monitor client-server web-traffic and *deliver direct marking services* to client group".)) Given such statements, Fernandez's proposed construction impermissibly broadens the scope of the claimed invention. *See C.R. Bard, Inc.*, 388 F.3d at 864; *Hill-Rom Co. v. Kinetic Concepts, Inc.*, 209 F.3d 1337, 1341 n.1 (Fed. Cir. 2000) (courts "have frequently looked to the abstract to determine the scope of the invention").

Nevertheless, Fernandez contends that the language of dependant claim 6 illustrates that the term "messages" is not limited to communications that are commercial, promotional, or marketing in nature.[5] Specifically, Fernandez contends that Defendants' construction is contrary to the doctrine of claim differentiation. "'Claim differentiation' refers to the presumption that an independent claim should not be construed as requiring a limitation added by a dependent claim." *Curtiss-Wright Flow Control Corp. v. Velan, Inc.,* 438 F.3d 1374, 1380 (Fed. Cir. 2006). The principle of claim differentiation is consistent with the 35 U.S.C. § 112, which stresses that a dependant claim must add an additional limitation to the subject matter claimed in the independent claim. *See* 35 U.S.C. § 112 ("[A] claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed."). In this case, claim 6 articulates a method for directing messages comprised of "a commercial offering." (JA, Ex. A, '829 Patent col. 10 ll. 46-50.) The "commercial offering," in turn, is comprised of "an application program, a still image, or a video stream." (JA, Ex. A, '829 Patent col. 10 ll. 49-50.)

Fernandez's claim differentiation argument fails for two reasons. First, claim 6 adds an additional limitation to the subject matter covered in claim 1. Under Defendants' proposed construction, the scope of claim 1 extends to all "communications whose content is *commercial,*

---

[5] Fernandez raised this argument for the first time at the claim construction hearing, after the parties had filed their respective claim construction briefs.

*promotional or marketing in nature*, in the form of symbol, audio, text, still image, video, or other media content or signal."  The language of claim 6, in contrast, imposes an additional limitation that further narrows the scope of the dependant claim to "commercial offerings comprising an application program, a still image, or a video stream."  (JA, Ex. A, '829 Patent col.10 ll.49-50).  Thus, because claim 6 adds an additional limitation, claim differentiation does not preclude adoption of Defendants' proposed construction.

Second, even if the Court were to conclude that claim 6 did not add an additional limitation, Fernandez's claim differentiation argument would also fail because the any presumption created under the doctrine of claim differentiation does not overcome the intended scope of the '899 patent.  Claim differentiation is not a "'hard and fast rule of construction.'"  *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) (*quoting Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1368 (Fed. Cir. 2000)).  While claim differentiation creates a presumption that each claim in a patent has a different scope, it cannot broaden claims beyond the scope of the invention.  *See id.*  Thus, any such presumption may be "overcome by a contrary construction dictated by the written description or prosecution history."  *Regents of the Univ. of Cal. v. DakoCytomation Cal., Inc.*, 517 F.3d 1364, 1376 (Fed. Cir. 2008) (*citing Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005)).  As noted above, the patent makes clear that the scope of the claimed invention is limited to communications whose content is commercial, promotional or marketing in nature.  Given the intended scope of the claimed invention, the Court also rejects Fernandez's reliance on the doctrine of claim differentiation because it would impermissibly expand the scope of the invention.

For the reasons stated above, the Court determines that the term "messages" refers to "communications whose content is commercial, promotional or marketing in nature, in the form of symbol, audio, text, still image, video, or other media content or signal."

H.      "*Directing one or more messages in response to the set classification wherein the directed one or more messages is provided by the server to the one or more clients classified in the first client set*"

At the claim construction hearing, the parties arrived at a partial agreement with respect to the meaning of the phrase, "directing one or more messages in response to the set classification wherein the directed one or more messages is provided by the server to the one or more clients classified into the first client set." (JA, Ex. A, '829 Patent col.10 ll.25-28.) Specifically, the parties agreed that the former half of the phrase - "directing one or more messages in response to the set classification wherein the directed one or more messages is provided by the server" - means "in response to a client being assigned to the classified set, the server selects and sends one or more messages through an on-line network." The parties continue to dispute the meaning of "to the one or more clients classified into the first client set."

Fernandez contends that the disputed phrase refers to "designated clients within each client set." Defendants argue that the phrase encompasses "every client in that set," rather than certain designated clients within the first client set. Defendants' proposed construction is consistent with the language of claim as well as the specification. As Defendants note, claim 1 requires that each client be classified "into a first client set," and that one or more messages be directed "to *the* one or more clients *classified into the* first client set." (JA, Ex. A, '829 Patent col.10 ll.23-28) (emphasis added.) The claim language expressly requires that the selected messages be directed to all of the clients in the classified client set, not to designated clients within a classified client sets. This

21

conclusion is also supported by the specification. For instance, the Summary of Invention section of the '899 patent describes the patented invention as one that "resides in software for directing on-line messages *to classified client set* adaptively according to monitored set characteristics." (JA, Ex. A, '829 Patent col.1 ll.33-35) (emphasis added.) In a similar vein, the specification explains that the "subject client may be classified in a set according to a subject attribute . . . ; then, a message or transaction signal representative thereof is sent to clients *classified in that set*." (JA, Ex. A, '829 Patent col.3 ll.17-21) (emphasis added); *see also* (JA, Ex. A, '829 Patent col.3 ll.48-55.))

Relying on the specification and prosecution history, Fernandez contends that the relevant claim language means that selected messages may be directed to "designated clients" within a classified set. Neither source of intrinsic evidence supports such a construction. With respect to the specification, Fernandez cites to the statement: "messages may be . . . transmitted through network 4 to designated client sites according to database 100 user client and grouping configurations." (JA, Ex. A, '829 Patent col.9 ll.24-28.) While this statement implies that messages may be transmitted to a subset of designated clients, it does not give a sense as to whether the "designated client sites" are: (1) necessarily designated clients within each client set or (2) the actual clients in the classified set, "designated" from among the entire collection of clients in the network. The cited prosecution history suffers from the same ambiguity. In support of its construction, Fernandez points to the following statement in the prosecution history: "[e]ssential to the claimed invention . . . are certain 'sensor' and 'sensor interface' through which one or more client attributes are determined, so that messages may be sent to any client classified in sets based on the client sensor data." (JA, Ex. B, Patent Prosecution History FH026.) Again, this language is ambiguous as to whether messages are sent to designated clients within the client set.

Thus, for the reasons stated above, the Court concludes that the phrase, "to the one or more clients classified into the first client set," means "every client in that set."

I.      *"The one or more clients"*

The parties dispute the meaning of the phrase "the one or more clients" in claim 1.  Plaintiff argues that the phrase means: "this includes at least the same client for which an attribute is determined."  Defendants assert that the term means: "this included at least the same client to which the sensor is coupled locally and for which an attribute is determined."   Construction of the phrase "the one or more clients" is dependant upon the Court's construction of the phrase "associated client."  Consistent with the Court's previous construction of the phrase "associated client" and for the reasons set forth in that subsection II(D), the Court adopts Defendants' construction of the phrase "the one or more clients."

J.      *"The interface receiving first network signal according to the classified set"*

Finally, the parties dispute the phrase "the interface receiving first network signal according to the classified set," which appears in claim 7.  Fernandez argues that the phrase means "the client interface receives a network signal through the network from the server, the network signal having been generated and/or sources by the server based on the classification of the client interface."  Defendants contend that the phrase should be construed to mean "the client interface receives a message through the network from the server, the message having been selected and downloaded by the server based on the classification of the client interface."  The parties' proposed constructions differ in two key respects.  First, Fernandez contends that the client interface receives a "network signal," whereas Defendants argue that the client interface receives a "message."  Second, Fernandez

23

requires that the server "generated and/or sourced" the "network signal," whereas Defendants require that the server "selects and downloads" the "network signal."

i.      *"Network signal" or "message"*

Defendants contend that, despite the use of the term "network signal" in the phrase "the interface receiving first network signal," the Court should construe "network signal" to mean "the message." Fernandez argues that Defendants' proposed construction is an attempt to rewrite the language of the claim. In support of their respective arguments, Fernandez and Defendants rely on the repeated references to "message[s] or . . . signal[s]" within the specification. For instance, the specification states: (1) "network 4, including server(s) 2 and client(s) 10, 20, 30 employ software and/or functionally equivalent . . . electronics for directing or targeting *on-line messages or electronic signals*," (JA, Ex. A, '829 Patent col.2 ll.28-32) (emphasis added); (2) "targeted *on-line message or electronic network signals,"* (JA, Ex. A, '829 Patent col.2 ll.54-55) (emphasis added); (3) "*directed message, transaction or network signal,* may include commercial offering, application program, still image, or video stream," (JA, Ex. A, '829 Patent col.2 ll.12-14) (emphasis added); and (4) "*a message or transaction signal* . . . is sent to clients classified in that set," (JA, Ex. A, '829 Patent col.3 ll.19-20) (emphasis added). According to Defendants, the cited statements illustrate that the specification repeatedly "commingles" the term "network signal" with the term "message" and that the "network signal" recited in claim 7 is merely an electronic representation of a message. Fernandez contends, however, that insertion of the word "or" in the statements cited above illustrated that a "network signal" and a "message" are distinct alternatives and, therefore, cannot be used interchangeably.

24

While the Court recognizes that the word "or" generally means "that the items in the sequence are alternatives to each other," s*ee Schumer*, 308 F.3d at 1312, the patent and prosecution history demonstrate that the patentee used the word "or" to represent interchangeable terms rather than distinct alternatives. *See Vitronics Corp.*, 90 F.3d at 1582 ("Although words in a claim are generally given their ordinary and customary meaning, a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history."). In this case, the patentee emphasized, in both the specification and the prosecution history, that the invention at issue "resides in software for directing *on-line messages* to classified client set." (JA, Ex. A, '829 Patent col.1 ll.33-35) (emphasis added); *see also* (JA, Ex. A, '829 Patent col.1 ll.37-40) ("Clients are classified into sets per criteria for contextual mapping of particular sets to corresponding targeted *on-line messages*") (emphasis added); (JA, Ex. B, Patent Prosecution History FH025) ("[T]he invention is a method for *sending messages* adaptively in a client-server network to clients classified in a set") (emphasis added); (JA, Ex. B, Patent Prosecution History FH026) ("Essential to the claimed invention, among other things, are certain "sensor" and "sensor interface" through which one or more client attributes are determined, so that *messages may be sent* to any client classified in sets.") (emphasis added).) Furthermore, while Fernandez argues that a "network signal" is merely a type of message in the context of the '899 patent, the patent does not support this interpretation. Thus, Fernandez's proposed construction would impermissibly broaden the scope of the '899 patent from an invention associated with directing messages to one that could encompass directing any signal transmitted over a network. Accordingly, the Court adopts Defendants' proposed construction of the phrase "the interface receiving first network signal."

25

ii.     *"Generated and/or sourced" or "selects and downloads"*

The parties also dispute whether claim 7 requires that the server "generated and/or sourced" the message received, as proposed by Fernandez, or that the server "selects and downloads" the message  received, as proposed by Defendants.  This dispute is nearly identical to the parties pre-hearing dispute regarding construction of the phrase "directing one or more messages in response to the set classification wherein the directed one or more messages is provided by the server to the one or more clients classified in the first client set."  Similar to the current dispute, the parties disagreed as to whether "provided by the server to the one or more clients" means that the server "generates and/or sources one or more messages" or "selects and downloads a message."  In support of their respective positions, the parties submitted the same arguments and evidence as they have with respect to the phrase currently at issue.  As noted above, the parties resolved the conflict with respect the language in claim 1 at the claim construction hearing and agreed that the disputed phrase means "the server *selects and sends* one or more messages."  The parties have not proposed a similar "selects and sends" construction with respect to the disputed language in claim 7, despite the fact that the parties rely on nearly identical proposed constructions, arguments, and evidence in both disputes.   Having considered the parties' arguments and proposed constructions with respect to claim 7, the Court concludes that both proposed constructions are inconsistent with the parties' previous "selects and sends" compromise.  *See Phillips*, 415 F.3d at 1314 (*citing Rexnord Corp. v. Laitram Corp.*, 274 F3d 1336, 1342 (Fed. Cir. 2001) ("Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of a same term in other claims.").   Accordingly, the Court orders the parties to meet and confer regarding this inconsistency.  Subsequent to this meeting, but no later than fourteen days from the

26

date of this Order, the parties shall submit to the Court either a revised agreed construction or individual revised proposed constructions to address and resolve the inconsistency identified with respect to the construction of the phrase "the interface receiving first network signal according to the classified set."  To the extent that the parties cannot reach an agreement and instead file individual revised proposed constructions, each party may also submit a position paper, not to exceed seven pages, in support of their respective positions.  Any such position paper must be filed no later than fourteen days from the date of this Order.

## CONCLUSION AND ORDER

For the reasons stated herein, the Court construes the disputed terms as set forth above.  The parties are ordered to meet and confer regarding the inconsistency identified with respect to the construction of the phrase "the interface receiving first network signal according to the classified set" and to file either an agreed revised construction or individual revised proposed constructions no later than fourteen days from the date of this Order.


So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date:  May 23, 2008