1    **TRANSCRIBED FROM DIGITAL RECORDING**

2                    IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
3                            EASTERN DIVISION

4    FERNANDEZ INNOVATIVE TECHNOLOGIES,    )
     L.L.C.,                               )
5                                          )
                    Plaintiff,             )
6                                          )
                 vs.                       )  No. 07 C 1397
7                                          )
     GENERAL MOTORS CORPORATION, et al.,   )  Chicago, Illinois
8                                          )  May 15, 2008
                    Defendants.            )  9:47 A.M.
9
                    TRANSCRIPT OF PROCEEDINGS – Motions
10      BEFORE THE HONORABLE MARIA VALDEZ, Magistrate Judge

11   APPEARANCES:

12   For the Plaintiff:        NIRO, SCAVONE, HALLER & NIRO, LTD.
                               181 West Madison Street
13                             Suite 4600
                               Chicago, Illinois  60602
14                             BY:  MR. PAUL K. VICKREY
                                    MS. TAHITI ARSULOWICZ
15
     For the Defendants:       KIRKLAND & ELLIS LLP (Chicago)
16                             200 East Randolph Drive
                               Suite 6100
17                             Chicago, Illinois  60601
                               BY:  MS. TIFFANY PATRICE CUNNINGHAM
18                                  MR. CRAIG D. LEAVELL

19

20
                       PAMELA S. WARREN, CSR, RPR
21                        Official Court Reporter
                        219 South Dearborn Street
22                             Room 1928
                        Chicago, Illinois   60604
23                          (312) 294-8907

24
     **NOTE:  Please notify of correct speaker identification.**
25

1    (Proceedings held in open court:)

2    THE CLERK:  07 C 1397, Fernandez Innovative

3  Technologies, L.L.C. versus General Motors Corporation, et al.,

4  plaintiff's motion to file under seal motion to compel and for

5  discovery sanctions and exhibits, plaintiff's motion to compel

6  and for discovery sanctions.

7    MR. VICKREY:  Good morning, your Honor.  Paul Vickrey

8  and Tahiti Arsulowicz for the plaintiff.

9    MS. CUNNINGHAM:  Good morning, your Honor.  Tiffany

10  Cunningham and Craig Leavell for the defendants.

11    THE COURT:  All right.  Good morning.

12    First let's deal with plaintiff's motion for leave to

13  file under seal.

14    Is there any objection?

15    MS. CUNNINGHAM:  No, your Honor.

16    THE COURT:  All right.  That motion will be granted.

17    Plaintiffs to provide the Court with the unredacted

18  versions as soon as possible.

19    MR. VICKREY:  Certainly, your Honor.

20    THE COURT:  Do we want a briefing schedule on the

21  motion to compel?

22    MS. CUNNINGHAM:  I think, your Honor, there are

23  certain issues we could resolve right here.  But to the extent

24  your Honor wants to consider granting any of their issues, we

25  would request a briefing schedule.

1          THE COURT:  Well, I don't have the unredacted

2     versions, so I'm not prepared to deal with the motion itself

3     today.  What we can do is if you want to come in and just argue

4     it or I can give you a week to respond.

5          MR. LEAVELL:  But if you have got five minutes now, we

6     think we could work it out with your assistance, at least some

7     of the issues.  If you don't have five minutes, we can brief

8     it.

9          THE COURT:  All right.

10          MR. LEAVELL:  (Unintelligible) brief.

11          THE COURT:  Why don't you go ahead and just step down

12     and let me deal with the other matters, and then we can handle

13     it.

14          MR. LEAVELL:  Thank you.

15          THE COURT:  All right.  Thank you.

16          MS. CUNNINGHAM:  Thank you, your Honor.

17          MR. VICKREY:  Thank you.

18        (Whereupon the Court turned her attention to other matters

19     on her call.)

20          THE CLERK:  07 C 1397, Fernandez Innovative

21     Technologies, L.L.C. versus General Motors Corporation, et al.,

22     plaintiff's -- recall on plaintiff's motion to file under seal

23     and plaintiff's motion to compel for discovery sanctions.

24          MR. VICKREY:  Your Honor, Paul Vickrey and Tahiti

25     Arsulowicz again for the plaintiff.

1    Briefly, if -- I'm not sure if your Honor has had a

2  chance to read the unredacted version, which is -- there is

3  very little redacted in the motion.

4    But the centerpiece of the motion is that the

5  defendants repeatedly on four separate occasions, have produced

6  documents, key documents either the day before while counsel

7  was on a plane traveling to a deposition, and sometimes right

8  during the deposition the key documents.

9    So we spend time rummaging through irrelevant

10  documents in preparation for the deposition.  They ambush us

11  with documents the morning of the deposition.

12    At first I thought, well, maybe the first time they

13  are just trying to take advantage of a first-year associate,

14  but this is a pattern.  It is a litigation strategy.  It

15  subverts the deposition process.

16    Among other things we're asking as sanction, a limited

17  sanction, that the last deponent -- this happened just, what, a

18  week ago -- be brought back from Detroit to Chicago for a

19  deposition at defendants's expense and that defendants be

20  ordered to produce documents in sufficient time in advance of

21  the deposition so we don't have this pattern of surprise

22  documents and subverted deposition preparation.

23    We are also --

24    THE COURT:  And the last deposition was Mr. Young?

25    MS. ARSULOWICZ:  Yes.

1    THE COURT:  All right.

2    MR. VICKREY:  And we're also seeking, your Honor, an

3  order compelling the defendants to produce a certain category

4  of documents, and Ms. Arsulowicz will address that.

5    MS. ARSULOWICZ:  The -- in addition to the documents

6  before a deposition, we repeatedly asked for financial

7  documents from defendants OnStar and General Motors.  We first

8  asked them about a year ago, on May 30th, 2007.

9    And there are kind of two aspects to this.  One is

10  that they produced summary documents of their financial records

11  in the first deposition.  We told them during the deposition we

12  wanted the originals as they are kept in the ordinary course of

13  business.  And we also told them in a letter after the

14  deposition we wanted the original documents, not just their

15  limited summary document.  We also told them in a meet and

16  confer.

17    And we still haven't got these documents.  So that's

18  why we are coming to your Honor on that.

19    We have also asked repeatedly for forecasting

20  documents related to the financial aspects.

21    So we have tried, we have begged, we have pleaded, we

22  have done everything we think we can to get these documents,

23  and that's why we're here.

24    THE COURT:  All right.

25    MS. CUNNINGHAM:  Okay.  Your Honor, I think there are

1    certain issues we can resolve pretty readily here if you have

2    the time to listen.

3        First, just referring to these financial documents in

4    particular that they just described, the parties in this

5    particular case have a joint stipulation that has been signed

6    by counsel for both parties and entered by the court.

7        I have a copy here I can pass up to you if that would

8    be helpful.

9        THE COURT:  Ms. Pagan and I can review it.

10      (Brief interruption.)

11       THE COURT:  Thank you.

12       MS. CUNNINGHAM:  In particular on this joint

13   stipulation, if you turn to the tab page -- paragraph 7, at the

14   joint stipulation on page 3, it provides that the party can

15   provide only summary financial information, which is what was

16   provided on behalf of GM and OnStar in accordance with this

17   stipulation.

18       THE COURT:  But let me just ask you though, the --

19   paragraph 7 also says the parties will meet and confer to

20   discuss the parameters of production of underlying documents.

21   Presumably one side requests it.

22       Does the stipulation set out a procedure for any

23   resolution on that?

24       MS. CUNNINGHAM:  No, your Honor, it does not state a

25   specific procedure.  But the parties have met and conferred,

1    and in particular an exhibit that was attached to the

2    unredacted version of the motion we last stated to them that we

3    are continuing to work to get an answer on that and we would

4    respond to them further.

5            However, the party did not wait for a response from us

6    because we were working on giving some of the underlying

7    documentation and instead filed this motion.

8            THE COURT:  All right.  Give me an idea of what the

9    discovery schedule is.  You have taken a number of depositions.

10           MS. CUNNINGHAM:  Uh-huh.

11           THE COURT:  How many other depositions need to be

12   taken now?

13           MS. CUNNINGHAM:  I believe they have two more.

14           MS. ARSULOWICZ:  Two more.

15           THE COURT:  And who are the deponents?

16           MS. ARSULOWICZ:  There is two financial 30 -- or one

17   is an individual, one is a 30(b)(6) for GM and OnStar.  Two

18   technical --

19           MS. CUNNINGHAM:  They are technical witnesses, not

20   financial.

21           MS. ARSULOWICZ:  And we also request Mr. Young for

22   further.

23           THE COURT:  For a continuing deposition?

24           MS. ARSULOWICZ:  Yes.

25           THE COURT:  All right.  So we have got two plus

1    Mr. Young.

2              MS. ARSULOWICZ:  Yes.

3              THE COURT:  And you have fact discovery cutoff at the

4    end of the month.

5              MS. CUNNINGHAM:  That's correct, your Honor.

6              MS. ARSULOWICZ:  Yes.

7              MS. CUNNINGHAM:  And in addition to --

8              THE COURT:  One other question that I didn't glean

9    from the motion.  When did you -- you file or you propound a --

10   document productions.  When did they respond?  How much time

11   has intervened between the time that we have had these

12   depositions and their production, their official production?  I

13   know your argument is they have been rolling in some documents.

14             MS. ARSULOWICZ:  I'm sorry, you're asking for the time

15   between?

16             THE COURT:  Their response to the document production

17   request that you made.  When did that occur?

18             MS. ARSULOWICZ:  Well --

19             THE COURT:  The bulk of it.

20             MS. ARSULOWICZ:  The bulk of it -- well, I mean, we

21   asked them directly after the deposition.  And then the last

22   time was a meet and confer on April 25th.  They have continued

23   to state that unless we give them a good reason, they are not

24   going to give us these financial documents.

25             And, your Honor, honestly in a deposition of a Toyota

1   witness, one of the witnesses cited -- or I asked her about a

2   document that said, GM and OnStar hide the costs of the

3   hardware costs of OnStar.  And I asked her to, you know, kind

4   of explain what that document meant.  And she couldn't figure

5   it out.  And they are a licensee of OnStar.  And she didn't

6   know how to break down the financial aspects.

7          And we're certain that our client's interest will be

8   compromised if we don't receive these underlying documents.

9          THE COURT:  Okay.

10         MR. LEAVELL:  Your Honor, if I may, just briefly.  I

11  was the attorney that handled the first deposition that they

12  are talking about where we provided the financial details of

13  the OnStar information at the morning of the deposition.

14         This is a 30(b)(6) deposition.  The witness the day

15  before the deposition did what he was supposed to do to prepare

16  to testify on 30(b)(6) topics.  He went around, he

17  investigated, he talked to people.  And, of course, he found

18  more information that went to the issue of damages.

19         He pulled some data dumps from the database that

20  includes the financial information and gave them exactly what

21  they need for this case, exactly what they were looking for in

22  a nice chart.

23         During the deposition they ask, well, do you have this

24  information in any other way?  And he said, well, there are

25  occasionally monthly reports that get circulated in meetings.

1    But those are just informal monthly reports just to keep the

2    people up to date on how OnStar is doing.

3            This is -- what we gave them was the official database

4    printout of the ordinary information as it is kept and limited

5    to the (unintelligible) specific information relevant to the

6    accused feature of OnStar.  We --

7            THE COURT:  Well, let -- let me ask.  I presume, and

8    not knowing, this is a presumption, that there was a document

9    production request --

10           MR. LEAVELL:  Yes.

11           THE COURT:  -- made.  And when was that production

12   request made?

13           MR. LEAVELL:  I think the request of the documents

14   about mid '07.

15           THE COURT:  Mid '07.

16           MR. LEAVELL:  We produced 300,000 pages of documents

17   and millions of pages of source code for them to review.  They

18   have reviewed those documents for a year.  We heard nothing

19   about any complaints or any follow up for any documents.

20           THE COURT:  And the document production request

21   included this summary financial information.

22           MR. LEAVELL:  Yes, but not the forecasts which --

23           THE COURT:  Right.

24           MS. CUNNINGHAM:  Three are separate issues then.

25           MS. ARSULOWICZ:  We disagree, but --

1        THE COURT:  All right.  So let's, for sake of this

2  argument, let's segregate out the forecast documents.

3        MR. LEAVELL:  Right.

4        THE COURT:  You said that the 30(b)(6) witness

5  undertook a review and had additional documents.

6        MR. LEAVELL:  Correct.

7        THE COURT:  Now one of the questions, of course, is

8  whether or not you initially undertook a reasonable review so

9  that these documents should have been produced earlier.

10        MR. LEAVELL:  Right.  We did, your Honor, and some of

11  this information was produced.  The statement in the brief that

12  there was no financial information produced, there was some.

13        But also we didn't know when they filed their

14  infringement or their document requests what the accused

15  features were.  They have been changing throughout the case.

16  And so when it came time for the deposition, we assumed that we

17  finally understood what they were accusing of infringement.

18        OnStar has 20 different features.  They have shifted

19  and changed their allegations throughout the case.

20        Once we knew what -- and we assumed that now that they

21  are taking depositions, they are going to stick with these

22  allegations.  We made sure to download and to produce the

23  relevant information on the relevant features, how many people

24  used the features each month, how much people pay for the

25  service, the -- the relevant information in a very simple to

1    use form and gave it to them at the deposition.

2            THE COURT:  So you haven't had a Markman hearing.

3            MR. LEAVELL:  We have had a hearing, but no order yet.

4            THE COURT:  Oh, right.  No order yet.

5            And I don't know if Judge Kendall requires a claim

6    construction chart.  Was one done for that hearing?

7            MS. ARSULOWICZ:  Yes, it was, your Honor.

8            THE COURT:  All right.  So --

9            MR. LEAVELL:  And then at the Markman hearing they

10   changed their allegations again.

11           THE COURT:  All right.  So I was going to ask you,

12   usually you know pretty much what's going to be at issue.

13           MR. VICKREY:  Your Honor, if I may, because I handled

14   the Markman hearing, what we did is we reduced the scope of the

15   accused functionalities of OnStar.  So that could not possibly

16   be an excuse as to why repeatedly at every single deposition

17   we're getting documents produced in Chicago the day before or

18   the morning of a deposition out of town when counsel is

19   traveling to these depositions.

20           So this -- the notion that they have been acting,

21   well, you know, we are just doing our job, there is a

22   pattern -- if it happens once in a while, I'll forget about

23   it.  Twice, I'm concerned.  Three times within four times for

24   the only four depositions, I am very concerned.

25           I hate to burden the Court with discovery disputes.

```
 1   That's not my character.  And but something has to be done

 2   here.  And we have two remaining depositions.  We need to bring

 3   Mr. Young back under these circumstances.  And this shouldn't

 4   happen again.

 5          THE COURT:  All right.  You indicated earlier that you

 6   think that some of this could be resolved --

 7          MS. CUNNINGHAM:  Yes.

 8          THE COURT:  -- without any further briefing.

 9          MS. CUNNINGHAM:  I do, your Honor.

10          THE COURT:  Let's get to the nut of that.

11          MS. CUNNINGHAM:  Okay.  One of the very easy issues to

12   resolve is the issue with respect to the TMS witness.

13          MR. LEAVELL:  This is Number 3 in their --

14          MS. CUNNINGHAM:  Number 3 in their brief.

15          MR. LEAVELL:  They request four things --

16          MS. CUNNINGHAM:  -- as per their request.

17          MR. LEAVELL:  -- your Honor.  This is Number 3.

18          MS. CUNNINGHAM:  Yes, your Honor.

19          And they asked us in particular regarding whether or

20   not we could produce a witness regarding the mylexuslink dot

21   com website.  We met and conferred on this issue and went in

22   and further got back to them in writing.  And actually it is

23   attached as Exhibit 3 to their brief.  I'm not sure if they

24   gave you a copy of it.

25          THE COURT:  Well, I don't --
```

1          MS. CUNNINGHAM:  Sorry.  But I have a copy here.

2          THE COURT:  -- I don't have an unredacted version of

3  anything, so --

4          MS. CUNNINGHAM:  I have a copy here.

5          MS. ARSULOWICZ:  I have a copy of everything.

6          MS. CUNNINGHAM:  And I highlighted (unintelligible).

7          THE COURT:  All right.  You see what she just gave me,

8  there is some highlighting on it.

9          MS. CUNNINGHAM:  That's Exhibit 2 --

10         MS. ARSULOWICZ:  Yeah.

11         MS. CUNNINGHAM:  -- the motion.

12         In particular here, your Honor, they want to know who

13  is in control of the mylexuslink dot com website.  We got back

14  to them in a timely fashion and told them that it is OnStar,

15  not TMS, who is knowledgeable about that website.

16         Accordingly we explained that a TMS witness cannot

17  testify further on that issue, instead they should ask OnStar

18  about this question.

19         Nonetheless they later, after the time that that

20  particular email --

21         THE COURT:  Let me stop you.  There is a microphone on

22  the podium, and you have the paper over it.

23         MS. CUNNINGHAM:  Oh, I'm sorry.

24         THE COURT:  We're going to hear this --

25         MS. CUNNINGHAM:  I'm sorry.

1          THE COURT:  Okay.  Go ahead.

2          MS. CUNNINGHAM:  Nonetheless after the time of that

3   particular email, they went ahead and filed this motion and

4   asked for that particular relief.

5          MR. LEAVELL:  Your Honor, if I may very quickly.

6          THE COURT:  Okay.

7          MR. LEAVELL:  The issue is they asked Toyota about the

8   Lexus dot com website.  The Lexus dot com website is

9   irrelevant.  It has nothing to do with the Lexus link feature

10  at issue.

11         The Lexus link feature is run by OnStar.  OnStar

12  provides their feature to Toyota, and Toyota calls it Lexus

13  link.

14         They spent a lot of time asking Toyota about that

15  website.  The Toyota witnesses said, we don't know anything

16  about it.

17         We have told them that OnStar runs that website, not

18  Toyota.  But they still want a witness from Toyota to talk

19  about the website.

20         We have already told them the people they are going to

21  talk to in a few weeks, the technical people at OnStar, can

22  talk about that website.  That issue is over.

23         THE COURT:  All right.  So why doesn't that take care

24  of it?  What is your belief at this stage?

25         MS. ARSULOWICZ:  Well, your Honor, when we were asking

1    Ms. Avary and Mr. Inouye, the two Toyota witnesses, it was our

2    understanding that that website was run by Toyota and that

3    Michelle Avary was not able to testify as to the technical

4    aspects of the website.

5              And Mr. Inouye then said that Ms. Avary the next day,

6    he told us that Ms. Avary would be able to testify.

7              If we can get a promise from defendants that they will

8    designate -- that they will include the Toyota accused products

9    functionality, and if we can get testimony from an OnStar

10   30(b)(6) technical witness, we'll take that.

11             THE COURT:  So you want a representation that the

12   OnStar 30(b)(6) will be able to testify as to the Lexus link

13   function, if there is any, on Toyota cars, is that --

14             MS. ARSULOWICZ:  Yes.

15             THE COURT:  Is that what --

16             MS. ARSULOWICZ:  Yes, that would be acceptable.

17             MR. LEAVELL:  Your Honor, if that is what it takes to

18   resolve this, that's fine.  They haven't served a 30(b)(6)

19   notice asking for that testimony from OnStar, but we're willing

20   to do it.

21             And, briefly, the questions they were asking were

22   about the Lexus dot com website.  When they were talking about

23   Ms. Avary and Mr. Inouye, they were asking about the wrong

24   website.  They were confused.  We cleared it up.

25             THE COURT:  There is two websites.

```
 1          MR. LEAVELL:  There is the Lexus that Toyota actually
 2    runs.
 3          THE COURT:  All right.
 4          MR. LEAVELL:  And then mylexuslink dot com, different
 5    domains.
 6          MS. CUNNINGHAM:  And just to clarify --
 7          THE COURT:  Counsel has made a representation though
 8    that he will ensure that the OnStar 30(b)(6) deponent will be
 9    able to testify to the extent that they know on the mylexuslink
10    dot com as it pertains to Toyota.
11          MR. LEAVELL:  Right.
12          THE COURT:  Is that correct?
13          MR. LEAVELL:  Right.
14          THE COURT:  All right.
15          MS. CUNNINGHAM:  That's correct, your Honor.
16          And then another issue that's pretty easy to resolve,
17    I think, is the forecast issue.  If your Honor has had an
18    opportunity to look very briefly at their discovery requests
19    that they propounded, which were included in the unredacted
20    version of the brief --
21          THE COURT:  Again I have no unredacted version.
22          MS. CUNNINGHAM:  I'm sorry.  In the redacted version.
23    They attached it as Exhibits 12 and 13.
24          MR. LEAVELL:  That's why I think we're going to have
25    to brief, your Honor, because you're going to have to look at
```

1    their requests.

2            THE COURT:  Yes.

3            MS. CUNNINGHAM:  I mean, to the extent I could, I just

4    want to speak very briefly in case it is something that could

5    be resolved readily.  But if not, counsel is absolutely correct

6    we can very easily brief that issue.

7            Their interrogatories that they point us to are 12 and

8    13, and it is the redacted version.  They attach them as

9    exhibits to that particular brief.

10           12, 13, and 14 that they point to do not mention the

11   word forecast whatsoever.  Those particular interrogatories

12   relate to identification of expert witnesses, the factual

13   contentions related to damages, and also the Georgia Pacific

14   factors.

15           Then they point to a series of document requests.  And

16   the document requests also do not relate to forecasts; instead,

17   they generally relate to commercialization, marketing and

18   sales, marketing materials, and, again, also expert witnesses.

19           We asked them during the meet and confer, could you

20   point us to a request that actually talks about the forecast

21   that you claim you requested?  We looked at the different

22   ones.  And as you can also analyze, you'll see that they did

23   not point us to a particular request.

24           Accordingly, that was the reason that we maintained

25   our objection to production of these particular documents.

1          THE COURT:  All right.

2          MS. ARSULOWICZ:  Your Honor, we maintain that we have

3     asked for these documents.

4          THE COURT:  Which request asks for the documents?

5          MS. ARSULOWICZ:  Specifically for Document Request

6     Number 47, we asked for underlying documents for an expert and

7     any expert testimony.  And it is -- if you are talking about a

8     damages expert, one of the most relevant factors in the

9     hypothetical negotiation for a patent licensing -- licensing

10    would be forecasting.  We -- we feel that's covered by that

11    request.

12         THE COURT:  So I heard you say Document Request 47,

13    and there was another one.  Do you have a number for that?

14         MS. ARSULOWICZ:  We have --

15         THE COURT:  So I can review it.

16         MS. ARSULOWICZ:  Yes.  We --

17         MS. CUNNINGHAM:  I have a copy if you want.

18         MR. LEAVELL:  Your Honor, do you have a copy of it?

19         THE COURT:  I don't, but --

20         MS. ARSULOWICZ:  We have a list.

21         THE COURT:  I'm not sure I can resolve it today

22    anyway.

23         MS. ARSULOWICZ:  Okay.

24         I mean, it is -- let me see here.

25         It is in our brief, but we -- we think that that

1    request specifically completely covers that information.  I --

2         MS. CUNNINGHAM:  I can hand up a copy if your Honor

3    would like to see it.

4         THE COURT:  You can provide it to Ms. Pagan.

5         But let me ask you, what's your expert discovery

6    schedule here?

7         MR. LEAVELL:  It is going to hinge off the Markman

8    order, which we don't have yet.

9         THE COURT:  Right.

10        MS. ARSULOWICZ:  That's going to be --

11        THE COURT:  So it is going to follow after Markman.

12        MS. ARSULOWICZ:  And so next no expert reports have

13   been submitted at this time, your Honor.

14        THE COURT:  Apart from it being relevant to an expert

15   document request, is there another document request that you

16   believe would require the production of forecast information?

17        MS. ARSULOWICZ:  We have outlined the document

18   Requests 23, 25, 41, 46, and 47.

19        MS. CUNNINGHAM:  And I have copies of that, to the

20   extent you wanted to review, your Honor.

21        THE COURT:  Why don't you go ahead and provide that to

22   me.

23        MS. ARSULOWICZ:  Sure.  Of course, your Honor.

24        (Brief interruption.)

25        MS. CUNNINGHAM:  I won't give you the whole document

1    but --

2         MR. LEAVELL:  Your Honor, here is a copy with the

3    highlighting.

4         THE COURT:  Let me ask plaintiff, do you have for me

5    today an unredacted version of everything?

6         MS. ARSULOWICZ:  Yes.

7         THE COURT:  Just -- why don't you just give me that.

8    You can give this back to him.  Please.  Thank you.

9         MS. ARSULOWICZ:  And it would be Exhibit 13 that she

10   was referring to right now, your Honor.

11        Starting on page 7 of that exhibit.

12      (Brief interruption.)

13        THE COURT:  All right.  So 23 documents refer to

14   commercialization, marketing and sales of the OnStar system.

15        All right.  Why don't that also include forecasts?

16        MR. LEAVELL:  Your Honor, forecasts are not sales,

17   they are not marketing materials, and it is not

18   commercialization, it is speculative.

19        THE COURT:  It is guesstimates

20        MR. LEAVELL:  Guesstimates.

21        MS. CUNNINGHAM:  Yes.  Correct.

22        MR. LEAVELL:  And they are always wrong anyway.  But

23   we don't think they fall within this.  This is referring to

24   actual sales information.

25        MR. VICKREY:  Well, your Honor, if I can address

1    that.  Even if the actual sales -- I mean, in a Georgia Pacific

2    analysis, hypothetical negotiation, you're talking about date

3    of the infringement.  It could be that there are -- they have

4    these wildly speculative but -- belief that this is going to be

5    the best thing ever, and it turns out to be wrong.  Their

6    subjective belief at the time is highly relevant to that

7    reasonable royalty analysis.

8          And, conversely, it could be that they don't think it

9    is going to go anywhere, but then it takes off.  But,

10   nonetheless, it is their mindset as of the date of the

11   hypothetical negotiation.

12         That's why I do believe that we're correct on not only

13   that, but any damage expert has -- walking through the Georgia

14   Pacific analysis, in the hypothetical negotiation, would have

15   to consider what the parties were thinking about, and --

16   including any projections.

17         But classic -- classic --

18         THE COURT:  Have you exchanged expert discovery yet?

19         MS. CUNNINGHAM:  No, your Honor.

20         MR. LEAVELL:  No, your Honor.

21         MS. CUNNINGHAM:  There is (unintelligible) hanging off

22   the Markman order, which has not yet come out.

23         MR. LEAVELL:  What we have done, we have served them

24   interrogatories saying, what is your damages theory.  They

25   didn't answer it.  They didn't provide us any substance at all.

1            So we don't have any basis yet to start working on a

2     rebuttal case.  They have asked for all documents our expert is

3     going to rely on.  Well, they are the plaintiffs.  They should

4     set forth a damages theory.

5            Once they do in an interrogatory, we will then start

6     working with our expert to prepare his rebuttal.

7            If in the process of his rebuttal, he believes that

8     forecasts are relevant to his opinion and he relies on them, we

9     will, of course, produce anything that our expert relies upon.

10           But they are the plaintiff, they haven't even bothered

11    to set forth the damages theory.

12           THE COURT:  Well, but one of the issues will be is

13    that they want to make sure that the forecast information that

14    they will -- they might have to contend with is -- you know,

15    that they have had an opportunity to review it with the

16    individuals who knew about it, reviewed it, analyzed it.

17           MR. LEAVELL:  Right.

18           THE COURT:  And they are going to come back and ask

19    for discovery and want to redepose those people.

20           MR. LEAVELL:  Well, your Honor, I understand.  And we

21    all know the Georgia Pacific factors very well, Mr. Vickrey and

22    I.  They didn't ask for it.  I mean, I don't mean to play

23    games.  And we're not playing games.  We have asked them which

24    requests cover it, and the ones they identify for us don't

25    cover it.

1          MR. VICKREY:  Your Honor, if I may, it is no secret as

2    to what our damage theory is in this case.  It is not lost

3    profits, it is not price erosion, it is a reasonable royalty.

4    And the notion that projections would not be included in

5    documents that relate to sales, that's -- these companies

6    always project, always project in their financial documents

7    always.

8          So why in the world -- what is the big secret?  Why

9    can't they just show us the projections?

10          All -- documents that refer or relate to

11   commercialization, marketing, and sales.  Projections certainly

12   relate to sales.  It is the projected sales.  The projected

13   demand is marketing.  Commercialization, projected.

14          So it is not just documents relating to what an expert

15   might rely on, but, I mean, this -- a company, such as OnStar,

16   GM, will routinely, if not quarterly, if not monthly, certainly

17   on an annual basis, project where they are going.  And it is

18   even more relevant because we understand that Toyota is going

19   to be switching out of.

20          THE COURT:  Well, let me ask.

21          Counsel, I hear that you are not necessarily arguing

22   that it is not relevant but because they did not propound --

23          MR. LEAVELL:  Correct.

24          THE COURT:  -- a request that you -- you are not

25   required to submit one.

1        MR. LEAVELL:  Correct, your Honor.

2        THE COURT:  All right.  That is the crux of your

3   argument.

4        As I read Document Request 23, it is sufficiently

5   broad enough to include marketing and sales.  And under the

6   analysis at issue here, projections would be encompassed by

7   that.  So the Court would read that they did in fact request

8   that information and they would be entitled to be provided that

9   information.

10        MR. LEAVELL:  Your Honor, can we limit it to the

11   forecast from the relevant time frame?

12        THE COURT:  Well, that's the only thing that is

13   relevant, the relevant time frame.

14        What is the relevant time frame?

15        MR. VICKREY:  Well, it is --

16        THE COURT:  I presume we're going to have a

17   disagreement.  And to the extent that I can rule today -- but

18   as -- these cases are usually complicated.

19        MR. VICKREY:  Certainly.

20        THE COURT:  And relevant time frame is usually the

21   biggest -- one of the biggest issues to contend with.

22        So what is your take on the relevant time frame?

23        MR. VICKREY:  My take on the relevant time would be

24   date of issuance of the patent till today.

25        MR. LEAVELL:  I think it is a little broad because the

1    -- as Mr. Vickrey said, the relative time frame is the time

2    where reasonable negotiation, hypothetical negotiation or

3    royalty rate would occur which would be either the issuance of

4    the patent or when OnStar first became aware of the patent,

5    which would be the date of the filing, the lawsuit.  Those

6    would be the two dates.

7              THE COURT:  The actual notice.

8              MR. LEAVELL:  Right.  So I don't think it goes through

9    today.  I don't think it keeps running.  It would be that

10   limited time frame, maybe between the issuance of the patent

11   and the filing of the lawsuit.

12             We'll look to see if there is other documents we can

13   produce, but those -- that's the relevant time period.

14             MR. VICKREY:  And if I may respond, your Honor, every

15   single damage expert is aware of a document called the Book of

16   Wisdom where you test your analysis based on what -- what

17   trans- -- what actually transpires.  And not only that, we have

18   different features, different functionalities that we're

19   accusing.  Plus we understand that Toyota is leading the OnStar

20   system.  So all of these certainly make relevant their

21   projections.  And our 23 doesn't have a time limit on it

22   either.

23             THE COURT:  Yes.  But the Court will infer a

24   reasonable time period.  So you're not entitled to just about

25   anything.

1          MR. VICKREY:  Certainly.  And we're not going back

2     to -- we're not going back to someone (unintelligible) we can

3     give us everything for the last ten years.  I think our

4     patent -- when did our patent issue?

5          MS. ARSULOWICZ:  November.

6          MR. VICKREY:  November of 2005?

7          MS. ARSULOWICZ:  I think so, yes.

8          MR. VICKREY:  So --

9          THE COURT:  And when did the case get filed?

10         MR. VICKREY:  This case was filed in --

11         MR. LEAVELL:  '07.

12         MS. ARSULOWICZ:  '07.

13         MR. VICKREY:  Early '07.

14         THE COURT:  And what is your argument, that even with

15    the Georgia Pacific analysis that you would be entitled to the

16    information as of the current time frame?

17         MR. VICKREY:  Again, your Honor, the Book of Wisdom,

18    which requires people to see where this is playing out as a

19    reality check, I agree, I fully agree that the hypothetical

20    negotiations should occur the date of first infringement.

21    Nonetheless, as different checks on the methodology, most

22    damage experts will employ the so-called Book of Wisdom.

23         And so we would maintain for, what, a three-year

24    period?

25         (Discussion off the record.)

1          MR. VICKREY:  So a three-year period for projections

2     is not unreasonable.

3          And we can even agree to some subset.  For example, if

4     they are projecting on a monthly basis, cut it down to

5     quarterly, annual.  For right now we don't even know what they

6     are.

7          MR. LEAVELL:  And, your Honor, I don't either.  I

8     don't even know if we have projectors.  I assume we do, but --

9          THE COURT:  All right.  But you're going to come back

10    then.  You have to find out what kind of projections you have.

11    You're going to find out if you -- if they are quarterly,

12    annually, monthly, and we'll deal with it then.

13         If you want to file something in opposition, do so

14    within seven days.  And then I'll bring you back the week

15    thereafter, and we'll have a ruling on this.

16         I do know that you have these time frames on

17    discovery.  But I also know that Judge Kendall would give me

18    some leeway on these particular issues only.

19         So if you are -- you know, you're not going to get an

20    additional extension on other matters, only on the matters that

21    I am going to be dealing with.

22         MR. VICKREY:  Fine.

23         THE COURT:  All right.  So let's bring you back the

24    week after next.

25         Ms. Pagan.

1          THE CLERK:  May 29th.

2          That would be May 29 at 9:30.

3          MR. VICKREY:  We're before Judge Kendall that day.

4     I'm not sure what time.

5          THE CLERK:  That's 9:00 o'clock.

6          MR. VICKREY:  Is it?

7          THE CLERK:  Judge Kendall is at 9:00 o'clock.

8          MR. VICKREY:  Okay.

9          MR. LEAVELL:  So, your Honor, we might -- may be a few

10    minutes late.  I guess that's the point.

11         THE COURT:  That's fine.  All right?

12         MR. VICKREY:  And then does your Honor want to address

13    at this point this -- the whole issue of Mr. Young and whether

14    documents for the future depositions will be produced in

15    sufficient time for us to review them?

16         THE COURT:  Well, we have got two future depositions.

17    I will tell you that you absolutely need to do a thorough

18    review of the information.  It is not something that should

19    happen where the day before -- and I understand 30(b)(6)

20    witnesses sometimes are different.  But it really -- the rules

21    still apply that you have to have undertaken a thorough review

22    of the relevant areas to determine whether the production was

23    satisfactory.

24         So I imagine you're going to be doing that before the

25    next deposition.

1    MR. LEAVELL:  We're already doing it, your Honor.  We

2  went back last week and made sure that we have gotten

3  everything.

4       And there are some more documents that they have

5  produced.  What we were going to do is -- the GM process, you

6  might imagine, of producing documents, is pretty slow.  They

7  have got a formal system we have to go through.

8       We're going to get those produced.  We're willing to

9  push back the depositions if we have to.  We'll keep them

10  apprised as to when everything is produced, whether everything

11  is produced, and we will -- and we're certainly trying to get

12  it all to them more than a week before the deposition.

13       And if we produce something less than a week before

14  the deposition, we'll work with them, if we need to move the

15  deposition, in order to do whatever they need to be satisfied.

16    THE COURT:  All right.  So the Court will grant the

17  relief that within one week prior to any deposition all

18  documents shall be produced after a secondary thorough review.

19  So you have already taken a review.

20    MR. LEAVELL:  Right.

21    THE COURT:  This will be a secondary review.

22    MR. LEAVELL:  Right.

23    THE COURT:  But any other issue?

24    MR. LEAVELL:  The Mr. Young issue.

25    THE COURT:  They want Mr. Young again?

1      MS. ARSULOWICZ:  Yeah.  Your Honor, this issue in

2  particular, was a case where counsel had the documents the day

3  before.

4      After I had left.  They had produced them after I was

5  on a plane to Detroit.

6      MS. CUNNINGHAM:  And also counsel -- the same copies

7  of those documents were brought to the deposition.  They were

8  produced to her in the PDF format so she could open them up,

9  review them via et al., et cetera.

10      They were brought to the deposition.  They were breaks

11  taken during the deposition.  And she chose to spend seven

12  hours talking on other subjects, including subjects outside the

13  scope of the 30(b)(6) topics on which that particular witness

14  was noticed, and then chose at the end of the day to say she

15  wanted to reserve additional time beyond those seven hours on

16  the outer documents that were produced.

17      It was not a huge set of documents.  It was eight

18  documents in particular that were produced on one very small

19  subject and one subset of topics, and she chose not to.

20      So we would ask the Court to not grant this relief in

21  light of the fact that she made a conscious decision to further

22  inconvenience this witness and have him come back and spend

23  more time with her.

24      MS. ARSULOWICZ:  Your Honor --

25      THE COURT:  Did you question him at all on the

1    documents?

2         MS. ARSULOWICZ:  Not the new documents, your Honor.

3         MS. CUNNINGHAM:  Yeah.

4         MS. ARSULOWICZ:  There were -- and there were 207

5    pages of new documents.  Like I said, produced three days after

6    I left.

7         And, your Honor to be honest, I prepare for days for a

8    deposition, and we -- they had done this at every deposition so

9    far.  You know, I reviewed documents, make a plan, and then at

10   last minute ambushed with new documents.  And I have no -- I

11   have no doubt that it has hindered my ability to take an

12   effective deposition.

13        We told them that we weren't going to let them

14   compromise our depositions any further.  And that after the

15   last meet and confer when we told them if you have any

16   documents, give them to us now, don't wait until the last

17   minute, don't wait till the night before, the morning of.  And,

18   your Honor, they did it again, and I wasn't willing to

19   compromise the deposition further.

20        THE COURT:  Well, but, counsel, you know that the

21   reality is sometimes it does happen, and you do have to take

22   the time out to undertake a cursory review at least, and then

23   ask very broad questions.  And maybe it is not going to be the

24   best deposition that you will have taken, but this is not an

25   unusual thing that arises.

1    MS. CUNNINGHAM:  And, your Honor, we were willing to

2    delay the dep and give her sufficient time to review the

3    documents.  We're willing to delay it if she needed an hour or

4    long to take breaks.

5         Previously in a deposition I was in with her, we did

6    take extensive breaks and told her she could have as much time

7    as she wanted because we wanted to give her adequate time to

8    time to prepare --

9         MS. ARSULOWICZ:  (Unintelligible) 45 minutes --

10         MS. CUNNINGHAM.  -- so she could -- (unintelligible).

11         MS. ARSULOWICZ:  -- the morning of for more documents

12    after they produced documents the day before.

13         MS. CUNNINGHAM:  And then -- to just finish my point

14    very quickly, the record reflects that we said she could take

15    additional breaks throughout the day, including a long lunch,

16    just so she could be fully prepared because we did not want her

17    to not feel that she had ample time to prepare for the

18    deposition.

19         THE COURT:  But there were over 200 documents?   200

20    pages?

21         MS. ARSULOWICZ:  Yes.

22         MS. CUNNINGHAM:  My understanding was there were eight

23    documents, and her representation was that it was 207 pages

24    with respect to those documents.

25         THE COURT:  That is -- that is a lot of pages to go

1   over after you're probably still preparing for what you knew of

2   weeks in advance.

3        MS. CUNNINGHAM:  Your Honor, just for what I know, I

4   have encountered as well, I know that in my particular

5   depositions people brought -- I would say even 500 pages to me

6   the day of, and I have taken breaks throughout the day just to

7   make sure that I at least did some review of those documents

8   and actually question the witness on those documents.  That

9   assuming, that after having seven hours with a witness, I would

10  give additional time beyond.

11       We wanted her to at least do a cursory review at a

12  minimum to determine if she even wanted to question the

13  witness, as opposed to just a matter of fact requesting

14  additional time.

15       MS. ARSULOWICZ:  Your Honor, there were a lot of --

16       MR. VICKREY:  Let me propose a compromise.  Your Honor

17  suggested something that this happens -- if -- this will happen

18  from time to time.  But I got to tell you, in 26 years of

19  practice I have never seen it happen repeatedly for every

20  single deposition.  After a while you get the sense that this

21  is a strategy.  It is not, oh, golly, we just found something.

22       In light of that fact, but in light of the fact that

23  we don't want to overburden folks, presumably they have got to

24  be up in Detroit at some point, we'll take a telephone

25  deposition of this fellow on the additional documents.  I mean,

 1  they are -- they presumably have to go -- go up there for more

 2  document issues, what have you.

 3       Might I suggest that compromise, your Honor, because

 4  counsel --

 5       THE COURT:  Well, it sounds like a very reasonable

 6  compromise.

 7       MR. LEAVELL:  Your Honor, as long it is a reasonable

 8  limit on the initial time.  Counsel decided to take the full

 9  seven hours that she's allowed under the rules.  I think

10  another half hour an hour --

11       THE COURT:  Why would you need more than one hour?

12       MR. VICKREY:  More than one hour is fine.

13       THE COURT:  One hour.

14       MR. VICKREY:  We'll do it.

15       THE COURT:  One hour limitation.

16       MR. VICKREY:  Yeah.

17       THE COURT:  Telephone deposition.

18       MR. VICKREY:  That's fine.

19       THE COURT:  Okay.

20       MR. VICKREY:  And then we'll arrange to have the

21  exhibits in counsels's hands so we can just flip through those

22  and address them telephonically.

23       THE COURT:  Doesn't mean you have to take the whole

24  hour, but it means you have up to --

25       MS. ARSULOWICZ:  I just want a chance to ask about the

 1   new documents.

 2           THE COURT:  I understand that.

 3           All right.  Anything else that we can resolve this

 4   morning?

 5           MR. VICKREY:  I think not, your Honor.

 6           THE COURT:  All right.

 7           MS. CUNNINGHAM:  Just to clarify, your Honor, you

 8   mentioned a topic or at least a couple topics you want us to

 9   possibly brief.  Could I just clarify to make sure I know which

10   ones you wanted briefing on?

11           THE COURT:  Well --

12           MS. CUNNINGHAM:  I think it was the forecast --

13           THE COURT:  -- I want the briefing on the forecast

14   documents.

15           But we're going to hear about the Book of Wisdom a

16   little bit more I imagine, so you can deal with the Book of

17   Wisdom and why you believe that the Book of Wisdom is not going

18   to give them any reason to ask for these forecast documents.

19           MS. CUNNINGHAM:  Okay.

20           THE COURT:  That's a specific issue, a specific legal

21   issue to deal with.

22           So we're dealing with a time factor of forecast

23   documents.

24           You can continue to argue whether or not they are

25   relevant at this stage at all, if that's what you so choose to

1    do.

2            I read Document Request 23 to be fairly broad.

3    Although there isn't a time limitation, the Court will impose a

4    time limitation.  The big issue is what will that time

5    limitation be.

6            There was also a suggestion that some summaries can

7    be -- summaries of the forecasts, for example, quarterly,

8    annually versus whether they are normally done weekly or

9    monthly.

10           And I know counsel was going to make a determination

11    after talking to those who know more as to whether or not there

12    are said summaries.

13           MR. VICKREY:  And, your Honor, hopefully we can try

14    to --

15           THE COURT:  You can continue to talk.

16           MR. VICKREY:  Yeah.

17           THE COURT:  There is nothing to forbid you.

18           MR. VICKREY:  Because if Mr. Leavell comes back to me

19    and says, hey, Paul, this is what we have got, I'll say, well,

20    why don't you make it two and a half years, Craig.

21           MR. LEAVELL:  We'll work it out.

22           THE COURT:  I have no doubt that you will work it

23    out.  You -- both sides seem to be very reasonable and

24    responsible while being strong advocates for your clients.  But

25    these issues, my guess is, could be worked out.

```
 1            If you want to file something, do so within seven

 2    days.  I'll bring you back.  I think the date that Ms. Pagan

 3    has already given you is the end of the month, and we'll see

 4    where we are then.

 5            MR. VICKREY:  Thank you, your Honor.

 6            MS. ARSULOWICZ:  Thank you, your Honor.

 7            THE COURT:  All right.  Thank you very much.

 8        (Which concluded the proceedings in the above-entitled

 9    matter.)

10

11               C E R T I F I C A T E

12

13            I hereby certify that the foregoing is a transcript of

14    proceedings before the Honorable Maria Valdez on May 15, 2008.

15    DATED:  May 30, 2008

16

17

18

19

20

21

22

23

24

25
```